# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### June 4, 2010 Session Heard at Nashville

## STATE OF TENNESSEE v. DAVID LYNN JORDAN

**Direct Appeal from the Court of Criminal Appeals**

**Circuit Court for Madison County**
**No. 05-431      Roy B. Morgan, Jr., Judge**

_____

**No. W2007-01272-SC-DDT-DD - Filed September 22, 2010**

_____

The defendant was convicted by a jury of the first degree murders of Renee Jordan, Jerry Hopper, and David Gordon, and the attempted first degree murders of James Goff and Larry Taylor, as well as leaving the scene of an accident. The jury sentenced the defendant to death for each of the first degree murders. The trial court sentenced the defendant to twenty-five years for each of the attempted murders, to be served consecutively, and to thirty days for the misdemeanor. On appeal, we hold (1) the trial court erred in ruling pursuant to Tennessee Rule of Evidence 615 that persons attending the guilt/innocence phase of the trial could not testify at the sentencing hearing; (2) the trial court's ruling regarding witness sequestration did not violate the defendant's right to a public trial; (3) the trial court erred in allowing an expert to incorporate hearsay testimony within his opinion without a limiting instruction; (4) the trial court did not err in permitting a victim's fiancée to offer victim impact testimony; (5) the prosecution engaged in improper argument during the sentencing hearing; (6) the trial court did not err in its instructions to the jury on the felony murder aggravating circumstance; (7) the various aggravating factors charged were not duplicative; (8) each of the death sentences satisfies our statutory mandatory review; and (9) the cumulative errors in this case do not entitle the defendant to relief. As to the remaining issues raised by the defendant, we agree with the Court of Criminal Appeals's conclusions and attach as an appendix to this opinion the relevant portions of that court's decision. The defendant's convictions and sentences are affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the**
**Court of Criminal Appeals Affirmed**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which JANICE M. HOLDER, C.J., and GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

George Morton Googe, District Public Defender, Jackson, Tennessee, and Lloyd Tatum, Henderson, Tennessee, for the appellant, David Lynn Jordan.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; James E. Gaylord, Asst. Attorney General; James G. Woodall, District Attorney General; Al Earls and Jody S. Pickens, Asst. District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS[1]

This case arises from a shooting incident on January 11, 2005, at the Tennessee Department of Transportation (TDOT) facility in Jackson, where David Lynn Jordan ("Defendant") killed three people: Renee Jordan, his thirty-one-year-old wife who was employed at TDOT; Jerry Hopper, an employee of the Tennessee Division of Forestry who was at the TDOT office; and David Gordon, a motorist Defendant ran off the road en route to the TDOT garage. Defendant also shot and injured two other TDOT employees, James Goff and Larry Taylor.

### State's Proof

The State's theory at trial was that Defendant first threatened and then decided to murder his wife because he believed she was having an affair with a co-worker, Johnny Emerson, and because she told him she wanted a divorce.

Johnny Emerson testified that he was employed as a mechanic at the TDOT garage where Mrs. Jordan worked. Emerson explained that he and Mrs. Jordan were "just real good friends," but acknowledged that their relationship had developed "[a] little bit" beyond a co-worker relationship. Physically, their relationship was limited to hugging and kissing. Emerson said that Mrs. Jordan had been talking about getting a divorce. On one occasion, Defendant telephoned Emerson at home regarding his relationship with Mrs. Jordan. Defendant told Emerson that he was "too old" for Mrs. Jordan and that he "needed [his] ass whooped." Emerson agreed with Defendant that he "didn't have no business doing what [he] did." Defendant also contacted Emerson's wife on numerous occasions. At some point prior to January 11, 2005, Emerson informed Mrs. Jordan that he was not going to divorce his wife. Emerson testified that he was not at work on January 11, 2005, because he was on medical leave.

---

[1] We have incorporated with only minor revisions the Court of Criminal Appeals's comprehensive statement of the proof adduced in this case.

Linda Sesson Taylor, an attorney in Jackson, testified that Mrs. Jordan hired her on December 14, 2004, to represent her in divorce proceedings against Defendant. She said she initially prepared the necessary documents for a contested divorce, and Mrs. Jordan told her she would have the money to pay her fee after the Christmas holiday. Taylor said she also prepared the paperwork to obtain a restraining order against Defendant, and Mrs. Jordan had an appointment scheduled for January 12, 2005.[2] Taylor identified a page out of her phone message book indicating that Mrs. Jordan had called her office on January 11, 2005, at 9:56 a.m. wanting to know how much Taylor charged for an uncontested divorce.

Kevin Deberry, the next-door neighbor of Defendant and Mrs. Jordan, testified that Mrs. Jordan called him on the night of January 10, 2005, and was upset with Defendant. About an hour later, Defendant came to Deberry's house and asked Deberry to take Mrs. Jordan's dog to their house and get his house key, but Deberry refused to do so. Defendant then told Deberry if he did not take Mrs. Jordan's dog to her, he "was gonna take it over there and shoot it in the driveway." As Defendant turned to walk away, Deberry noticed what he believed to be a "snub-nose .38" in Defendant's back pocket. Defendant then turned around and told Deberry that he "better watch [his] back, you never kn[o]w which way the bullets are gonna fly." Deberry called Mrs. Jordan and told her to take her child and leave the house because Defendant was on his way over there. Mrs. Jordan told Deberry that Defendant had left some threatening voice mails on her phone. Defendant later called Deberry and apologized. The two men talked "for awhile" and Deberry offered Defendant a drink. Defendant declined but called back later and accepted Deberry's offer of alcohol. Deberry said that he took a half-gallon bottle of vodka to Defendant's house at about 1:00 a.m. and put it in the freezer. Although Defendant and his children were still up when he arrived, Deberry did not stay and returned home.

Kenneth Evans, Mrs. Jordan's cousin, testified that he was aware that Defendant and Mrs. Jordan were having marital problems and, on January 10, 2005, Mrs. Jordan called and told him that "she was about to have a nervous breakdown, and she was scared of [Defendant], that he was calling threatening her." Mrs. Jordan told Evans that Defendant "was on his way out to the house and that he said . . . it didn't matter how many lawyers she had and how much money she had, that what he had for her wasn't going to do her any good." Evans advised Mrs. Jordan to leave the house and go to the police department, but she refused to do so, saying that Defendant had "had run-ins with the police department before. He would shoot me there whether the police was there or

<hr>

[2] On direct examination, Ms. Taylor testified that Mrs. Jordan's appointment was scheduled for January 11, 2005, but, on cross-examination, after reviewing her statement, she agreed that the appointment was for January 12.

not, and he would probably shoot them, too."  Evans then told her to come to his house, which she did.  After she arrived, they took Mrs. Jordan's three-year-old daughter to Mrs. Jordan's mother's house.  Evans later hid Mrs. Jordan's car at a friend's house, and they returned to Evans' home around 10:30 p.m.

The following morning, January 11, 2005, Mrs. Jordan and Evans, a TDOT "[p]arts runner," went to work.  Mrs. Jordan worked in the office of the TDOT garage, which was commonly referred to as "the crow's nest."  That morning, Evans was in the crow's nest with Mrs. Jordan until approximately 11:10 a.m., when he left to go pick up some parts.  Ricky Simpson and James Goff were in the office with Mrs. Jordan when he left.

Vernon L. Stockton, Sr. testified that on January 11, 2005, he was employed as an equipment mechanic at the TDOT garage which was located in the same building as the crow's nest where Mrs. Jordan worked.  He said he knew that Mrs. Jordan and Defendant were having marital problems.  Between 9:30 and 10:00 a.m. on the morning of January 11, Mrs. Jordan handed Stockton her portable phone when it rang and asked him to answer it.  Stockton recognized the caller's voice as that of Defendant.  Defendant asked to speak to Mrs. Jordan, but Stockton told him that she was in the restroom because she did not want to talk to him.  Stockton said he later left TDOT to pick up some parts and was not present when the shooting occurred.

Sonny Grimm testified that he was riding in a Ford pickup while Paul Forsythe was driving it westbound on Lower Brownsville Road on January 11, 2005.  The two men worked for Ralph's Trailers and were on their way to pick up some starter fluid for a backhoe.  A green car was traveling in front of them.  As they approached Anglin Lane, Grimm saw Defendant, who was driving a red pickup truck, run a stop sign and strike the green car, knocking it off the road.  Grimm wrote down the license plate number of Defendant's vehicle; he said that Defendant continued traveling toward the TDOT garage.  Grimm, Forsythe, and the driver of the green car followed Defendant to the garage.  There, Grimm saw people running everywhere.  Forsythe gave the driver of the green car the license plate number of the red pickup truck.  Defendant came out of the garage and told the driver of the green car, "You better leave."  The driver responded, "I'm not going [any]where."  Defendant said, "yes, you are, too," reached inside his truck, pulled out a rifle, and shot the driver.

Paul Forsythe testified that, on the morning of January 11, 2005, he and Sonny Grimm were traveling west on Lower Brownsville Road behind a green car when they saw a red Mazda pickup truck come down Anglin Lane, run a stop sign, and strike the green car, knocking it off the road.  Forsythe followed the truck to get its license plate number for the driver of the green car.  Because he was driving, Forsythe called out the

4

license number to Grimm, who wrote it down. The pickup truck then ran a four-way stop and turned into the main entrance of TDOT. Forsythe called 911 and pulled into the TDOT parking lot. The green car then pulled up, the driver got out, and Forsythe gave the driver, David Gordon, the tag number of the pickup truck. As Gordon was walking back to his car, Defendant came out of the TDOT building and told Gordon to leave. When Gordon said, "I'm not going [any]where," Defendant said, "You will" and then reached inside his truck and pulled out a long gun. Gordon threw his hands up in the air and told Defendant, "Please don't shoot. Wait a minute." However, Defendant started shooting, and Forsythe and Grimm fled the scene.

Randy Joe Perry, a TDOT employee, testified that on January 11, 2005, Defendant came to the TDOT garage and pushed Perry out of his way as he approached the steps leading up to the crow's nest where Mrs. Jordan worked. David Pickard, another TDOT employee who was standing near Perry, said, "Who was that son-of-a-bitch?" Defendant, who had his right hand in his coat pocket, turned around and gave Perry and Pickard a "hard look" before going upstairs to the crow's nest. Perry then heard three or four gunshots and, looking through the window in the crow's nest, saw Defendant pointing a gun at Jerry Hopper who was sitting in a chair. Perry heard another gunshot and saw Hopper slump over. Hearing more gunshots, Perry ran and got behind his truck. Shortly thereafter, Defendant calmly walked outside to his vehicle. Perry next noticed a man get out of another vehicle and walk toward Defendant. Defendant reached inside his truck and retrieved a rifle. The man who had been walking toward Defendant stopped and raised his hands. A few seconds later, Defendant fired several shots at the man. Perry described the shots as coming from a "fully automatic" and so quick that he could not count them. The man Defendant shot "went out of sight down behind the vehicle." Defendant walked over to the fallen man, shot again, "and then he turned and just calmly walked back towards his truck, put the rifle in his truck, just eased in there and drove off just as easy" toward the front gate.

David Thomas Pickard testified that he was standing near the stairs with Randy Perry and other employees when Defendant came in the garage and shoved him and Perry backwards as he walked past the group of men. Pickard responded by saying, "Who does that crazy son-of-a-bitch think he is?" Defendant, who smelled of alcohol, turned around and got in Pickard's face "like he wanted to whoop [him]." Defendant then proceeded upstairs to the crow's nest where Mrs. Jordan was facing the window. Pickard saw Defendant shoot Mrs. Jordan and described the shooting: "The first time it went 'Pow' and she went like this and come back and he went 'Pow, Pow, Pow,' like that." Pickard ran out of the garage to his office located across from the garage. After instructing the employees in his office to lock the door, Pickard went back outside and saw Defendant, pistol in hand, exit the garage and go to his truck and retrieve a rifle. Pickard went back inside the office and, a few minutes later, saw Defendant leave in his truck. Pickard then went to the crow's nest where he saw Mrs. Jordan and Jerry Hopper lying on the floor.

5

He said he looked at Mrs. Jordan and knew she was dead, but Hopper was still alive and a man was trying to resuscitate him. Outside in the parking lot, Pickard saw another man lying on the ground. He said the man was not dead at that time, but he "was turning real yellow-looking and blood was everywhere."

James Goff testified that he was in the crow's nest with Mrs. Jordan, Larry Taylor, and Jerry Hopper when Defendant came in, raised his shirt, and pulled out what appeared to be a nine-millimeter pistol. Mrs. Jordan had her back to the door, and Defendant called out her name. Mrs. Jordan turned around, and Defendant started shooting. Goff stated that Defendant was about 6 feet away. Defendant shot Mrs. Jordan in the chest and fired additional shots, including what appeared to be a shot to the forehead. Defendant then shot Hopper. Taylor dove under a desk, and Defendant shot Goff in the leg, the right side of the neck, the arm, and the stomach. Although he did not see Taylor being shot, Goff heard two more shots and heard Taylor grunt. As Defendant was leaving the crow's nest, Goff heard him mutter, "I love you, Renee."

After Defendant left the room, Goff got up and asked Taylor about his condition. He saw Hopper lying on the floor "in bad shape" and Mrs. Jordan was dead. Goff was then able to make his way to the main office for help. He said he was hospitalized for three days as a result of his injuries.

Larry Taylor testified that he was ending a telephone call inside the crow's nest when Defendant entered the room, stood there "for a moment or so," pulled his coat back, brandished a weapon, and took a "police stance." Defendant then called Mrs. Jordan by name and, when she turned to face him, shot her. One gunshot struck her in the stomach area. She fell back in a chair, and Defendant fired two additional shots, with the second shot striking her torso "a little higher up" and the third shot striking her in the head. Mrs. Jordan fell to the floor, and Taylor could tell that she was dead. Taylor dove under a desk for protection, heard more gunshots, and saw Goff fall. He then heard more gunshots and felt pain in his legs. Taylor heard the door close, and Goff asked him if he was all right before leaving the room. Taylor then got up and saw Hopper on the floor on his knees with his face in his hands and saw Mrs. Jordan on the floor with her face in a pool of blood. He called 911 and was trying to assist Hopper when he heard the door open and saw Defendant with "a rifle-type gun." Taylor looked Defendant "square in the eye" and stood back up, holding both his hands in front of him. He asked Defendant if he could leave, and, after a brief pause, Defendant said, "Yeah, you can go out now." After Taylor got downstairs, he heard gunshots in rapid succession and hurriedly went out the door. He saw Goff, who was "kind of delirious" and holding a towel to his neck, and told another employee, Alvin Harris, to drive Goff to the hospital in the parts truck. Taylor then got in his car and drove himself to the hospital where he was treated for the gunshot wounds to his legs.

Freddie Ellison, a reserve sheriff's deputy and a mechanic at TDOT, testified that when he returned to the garage from his lunch break around 11:30 a.m., people were running out of the garage. He then observed Defendant, whom he had known for approximately twenty years, walk out the roll-up doors of the garage. Ellison asked Defendant what he was doing. Defendant raised his right hand and Ellison saw two semi-automatic handguns. Defendant said, "Go on. Back off. Just go on. Back off." Defendant had his hand on one of the guns. Ellison retreated to the back of the building where he observed David Gordon pull up in a green car. Gordon announced that "[t]he guy in the red pickup truck has run over me," and Ellison advised Gordon to "back off" because Defendant had a gun. Gordon refused, stating that he had the police on the way. Ellison then heard "automatic" gunfire and called the Madison County Sheriff's Department for assistance. He and Willie Martin left TDOT and went "out on 223." He saw Defendant leave in his red pickup truck, driving normally and headed toward Jackson.

Shortly thereafter, Ellison observed an unmarked police unit and advised dispatch to instruct the unit to follow Defendant. Ellison then returned to the TDOT garage and saw David Gordon on the ground. Gordon had been shot multiple times. Inside the crow's nest, Ellison discovered "blood all over the floor" and saw Mrs. Jordan lying on the floor with multiple gunshot wounds. He described Mrs. Jordan as being "shot all to pieces," including being shot in the forehead. Jerry Hopper had been shot several times in the chest.

Alvin Harris, a "store clerk" at TDOT who picked up and delivered parts, testified that he heard gunshots and went to the garage where he encountered Goff who was holding his throat and bleeding. He also saw Taylor who was "real panicky" and pointed to his legs when Harris asked him if he was hurt. Taylor told Harris that Defendant had shot Mrs. Jordan and that she was "gone." Because Goff was losing a lot of blood and Harris feared death was imminent, Harris decided to drive Goff to the hospital rather than wait for the ambulance.

Darrell Vaulx, a TDOT mechanic, testified that as he was leaving the shop on January 11, 2005, he saw Defendant, Mrs. Jordan, Hopper, and Taylor through the glass window in the crow's nest. Defendant pointed a gun at Mrs. Jordan, and she fell. Vaulx heard two more gunshots and saw Defendant turn toward the men in the crow's nest. Vaulx said he and other employees ran outside to the parking lot where Vaulx saw Defendant's red Mazda pickup truck. Vaulx then saw Defendant come outside and calmly walk to his truck. Thinking that Defendant was leaving, Vaulx ran inside to the crow's nest where he found Mrs. Jordan on the floor with three gunshot wounds to the head. Someone yelled, "He's coming back," and Vaulx ran back outside to the parking lot and noticed that Defendant's truck was still there. He then heard a noise that sounded

like an airgun or a rifle. After someone said Defendant was getting in his truck and leaving, Vaulx went back inside and found Hopper who was "breathing just a little bit" and "[s]quirming" like he was in pain. Vaulx administered CPR to Hopper until the paramedics arrived.

George Washington Bond, a TDOT employee who worked in the car wash room in the garage, testified that he heard "three pops," looked out the window in the garage door, and saw Defendant standing over "the victim." Defendant then looked at Bond and shook his head, which Bond interpreted to mean "[d]on't get involved." Bond saw what appeared to be the grip of a gun in Defendant's hand. Defendant then walked into the garage and went to the crow's nest. Bond saw Defendant pointing a long gun toward where Mrs. Jordan sat. Bond then ran to another building and did not return to the garage. On cross-examination, Bond acknowledged that he did not see Defendant shoot "the victim."[3]

Barbara Surratt, Mrs. Jordan's mother-in-law from a previous marriage, testified that, even after Mrs. Jordan and her son divorced, she remained "very close" with Mrs. Jordan. During the early part of 2005, Mrs. Jordan was staying with Surratt at her home on Old Pinson Road. On January 11, 2005, at approximately 1:30 a.m., Surratt received a telephone call from Defendant. Defendant told her that he knew Mrs. Jordan was not there and asked her to tell Mrs. Jordan "happy birthday" the next time she saw her. Surratt stated that Mrs. Jordan's birthday was not until February. Around 11:30 a.m., Surratt telephoned Mrs. Jordan at work and, during their conversation, heard an "ungodly racket, loud noises" and a sound like "a chair go across the room." She screamed Mrs. Jordan's name, but got no answer. After it became quiet, Surratt heard Defendant say, "Renee. Renee. I hate you."

Jackson Police Sergeant Mike Thomas testified that he was on patrol in an unmarked cruiser on Vann Drive when he received a call about the shooting at the TDOT garage. En route to the scene, Sergeant Thomas was advised that the suspect had a machine gun. Before reaching the TDOT garage, he observed a red Mazda pickup truck matching the description of the suspect's vehicle and began pursuit of the truck. The truck ran a stop sign. Shortly thereafter, a marked patrol unit, driven by Sergeant Sain, passed the truck on Anglin Lane. Sergeant Sain turned his cruiser around and joined the pursuit. Another unmarked unit, driven by Captain Priddy, joined the pursuit after the suspect's vehicle forced Captain Priddy's vehicle off the road. Officer Maxwell placed his patrol cruiser in position to do a partial roadblock. The suspect's vehicle hit Officer

---

[3] Although Bond did not identify "the victim" by name, the context of his testimony indicates that he was referring to David Gordon.

Maxwell's car, and Sergeant Thomas pulled in behind it to block it from leaving. The suspect, identified as Defendant, was taken into custody. A search of Defendant's person revealed a loaded .45 caliber pistol and a loaded nine-millimeter pistol. Inside Defendant's truck, the officers discovered a rifle and a shotgun.

Officer Ted Maxwell of the Jackson Police Department testified that he responded to a call concerning the shooting at the TDOT garage. En route to the scene, he encountered Defendant, driving a red pickup truck, followed by two police units. Officer Maxwell said he was traveling north on Anglin Lane, and Defendant was traveling south. Ultimately, Maxwell managed to stop Defendant by ramming the front of his vehicle. Defendant got out of his vehicle, and Maxwell noticed a gun in the small of his back under his belt. Sergeants Sain and Thomas placed Defendant on the ground and removed two handguns from him that Maxwell identified as an Intra Arm Star .45-caliber semi-automatic with a clip containing six live rounds and one live round inside the chamber, and an Intra Arm Star nine-millimeter semi-automatic with a clip containing two live rounds and one live round in the chamber. Maxwell said that eight .45-caliber and nineteen nine-millimeter rounds were recovered from Defendant's pockets.

Tennessee Highway Patrol Sergeant Johnny Briley testified that he initially received a call regarding a hit-and-run accident on Lower Brownsville Road at Anglin Lane involving a red Mazda pickup truck. While proceeding to that location, he received another call about the shooting at the TDOT garage. He received information that there were multiple victims involved. Before he reached the TDOT garage, he observed that the suspect vehicle had been pulled over by Jackson police officers. He stopped at the scene. Sergeant Briley said that he had known Mrs. Jordan and her family for thirty years and also knew Defendant. As Defendant stood up, he told Sergeant Briley, "She fucked me over, Johnny." Sergeant Briley responded, "No, she didn't, David." Sergeant Briley, who was standing within a foot of Defendant, detected an odor of alcohol on Defendant's person. Defendant was subsequently placed in the backseat of a police car.

Jackson Police Officer Rodney Anderson testified that, en route to the scene of the shooting, he received a call that the suspect was headed down Anglin Lane. Officer Anderson turned onto Anglin Lane where he observed a vehicle matching the description of the suspect's vehicle between two patrol cars. The driver of the vehicle, Defendant, was taken into custody and placed in the backseat of Officer Greer's marked police unit. As Officers Greer and Anderson were transporting Defendant to the Criminal Justice Complex, Defendant spontaneously told them that:

> he could have cut the police in half with his weapon, that he had full auto.
> He stated that his wife's dead and she's full of holes. He stated she drove
> him crazy . . . by fucking around on him, and he advised that he shot her

with her brother's gun. He also stated that he feels sorry for his daughters, and that Mrs. Jordan wouldn't be fucking around on anybody else.

Defendant also said that the other people "just got in the way" and asked how many people were hurt. Defendant also said that his wife "hurt him and tore his heart out" and that he had been "going crazy" for a month. Officer Anderson said that Defendant smelled of alcohol.

Investigator Jeff Shepherd of the Jackson Police Department testified that, as part of his investigation, he retrieved and recorded voice mail messages left on Mrs. Jordan's cell phone. The audiotape of the messages was entered into evidence and played for the jury; a transcript of the messages was also provided. The messages included one left at 10:48 p.m. on January 10, 2005, stating "You're the only asshole on the face of this earth that I truly hate"; one left at 2:11 a.m. on January 11, 2005, stating "I'll see you at work, bitch"; one left at 2:17 a.m. on January 11, 2005, stating "I hope you go to work tomorrow, bitch, 'cause you'll be there one day. It may not be tomorrow, but I will catch up with your raggedy ass. Your day is coming."; and one left at 2:19 a.m. on January 11, 2005, stating "You home wreckin', low life, sorry mother fuckin' bitch. Your ass is gonna pay." Additionally, Investigator Shepherd was involved in the booking process of Defendant, during which Defendant asked him if Mrs. Jordan was "real bad messed up." Defendant started crying and told Shepherd that most people probably thought he was crazy, but he was not crazy, he was "driven to crazy." Defendant also said that the assault rifle he used in the shooting belonged to his brother-in-law, Dale Robinson.[4]

Trent Harris, a paramedic at Jackson-Madison County General Hospital, testified that he and Corey Shumate, an emergency medical technician, responded to the scene at the TDOT garage, arriving at 11:39 a.m. They first attended David Gordon, who was lying on his back in the parking lot and appeared to have gunshot wounds to the upper right and upper left portion of his abdomen. Gordon was not breathing but had a faint pulse. Harris intubated Gordon and immediately began transportation to the hospital. En route, Gordon lost a pulse and CPR was initiated. Upon their arrival at the hospital, Gordon's care was transferred to the hospital's trauma team.

Dr. Herbert Lee Sutton, a trauma surgeon at Jackson-Madison County General Hospital, testified that he tried to save David Gordon's life once he arrived at the hospital. Dr. Sutton was able to regain a heartbeat on Gordon and performed surgery to try to stop the bleeding in his abdomen and perineum. Dr. Sutton described what he saw when he

---

[4] The record reflects that Investigator Shepherd referred to Defendant's brother-in-law as Dale "Robinson." However, Mrs. Jordan's father's last name is "Roberson" according to the record.

surgically opened Gordon's abdomen: "[T]he blast injury from what he was shot with had almost morselized his intestines. It was like soup. And I'm quite sure even if I had stopped him from bleeding and he had regained everything, he probably wouldn't have had any small intestine left from what I could see." Despite all of Dr. Sutton's lifesaving procedures, Gordon died at 12:47 p.m.

Dr. Sutton testified that he also treated James Goff on January 11, 2005, for multiple gunshot wounds which he described as wounds to the left arm, abdomen, left thigh, and neck. The gunshot wound to the neck "went anterior to the trachea and the carotid vessels which are the main vessels that go[] to his brain." The bullet did not hit any major arteries or veins. Dr. Sutton stated that Goff remained hospitalized until January 13, 2005.

Eric Leath, a paramedic with the Medical Center EMS, testified that he was also dispatched to the TDOT garage. Upon his arrival, he was directed inside to an office where he observed a man lying on the floor on his back and a woman lying inside the door to the left. The woman had "a massive . . . injury to her head that had blood tissue lying all around, pooled around her head" and had no signs of life. The other victim, Jerry Hopper, was very pale and had "some gasping or . . . agona[l], gasping-type breaths, just very shallow, slow." Hopper had a faint carotid pulse. Leath inserted a breathing tube, but Hopper was unresponsive. A Jackson police officer offered assistance to Leath and began CPR. Hopper was then moved to an ambulance and transported to the hospital. Upon arrival at the hospital, Hopper exhibited no signs of life.

Dr. David James testified that he treated Jerry Hopper, who had two gunshot wounds to his abdomen. Upon Hopper's arrival at the hospital, he was not breathing and all attempts at resuscitation were unsuccessful. Hopper was pronounced dead at 12:34 p.m. Dr. James also treated Larry Taylor at the Jackson-Madison County General Hospital. Taylor had suffered gunshot wounds to both of his upper legs.

Dr. Tony R. Emison, the medical examiner and coroner for Madison County, testified that he requested autopsies on the bodies of the three deceased victims. The bodies were sent to the state medical examiner's office in Nashville.

Dr. Staci Turner testified that she performed the autopsy on Mrs. Jordan. Dr. Turner found that Mrs. Jordan had been shot eleven times, resulting in wounds to the head, torso, and right leg. Dr. Turner found injuries to the scalp, the skull, the bones of the face, the brain, multiple ribs, the right lung, the diaphragm, the liver, the right kidney, the stomach, the small intestine, the urinary bladder, and the uterus. Dr. Turner recovered multiple bullets, bullet jackets, bullet cores and white plastic disk fragments during the

11

autopsy. The gunshot wound to Mrs. Jordan's forehead was fired from a handgun within a foot of the body.

Dr. Turner discovered a visible bullet in a partial exit wound in the back of Mrs. Jordan's head. She recovered the bullet and the jacket that had separated from the bullet. The bullet was identified as a Black Talon-type bullet, one fired from a handgun. She described the bullet as having a bullet core and a jacket, "and when it enters the body, the jacket usually opens and forms sharp points that look like talons." Other fragments discovered in Mrs. Jordan's body were identified as coming from a high-powered assault rifle. Dr. Turner described the wounds associated with the bullets fired from the assault rifle: "They went through multiple ribs on the right side of the body, through the right lung, through the diaphragm . . . , through the liver and the kidney and into the spinal column and then lodged in the muscle of the back with some fragments scattered throughout the organs." Two notes were found in the victim's clothing, both addressed to Mrs. Jordan. One note was signed, "Your faithful faithful worried David." The second note was signed, "Your forgiving husband, David Lynn Jordan." Dr. Turner concluded that the cause of Mrs. Jordan's death was multiple gunshot wounds.

Dr. Amy R. McMaster testified that she performed the autopsy on Jerry Hopper. Hopper had suffered multiple gunshot wounds and had multiple abrasions and lacerations resulting from these wounds. Dr. McMaster discovered a gunshot wound to the right wrist and two gunshot wounds to the right side of his abdomen. She recovered two projectiles from Hopper's body. The projectiles were large caliber deformed hollow point bullets, which were consistent with those fired from a nine-millimeter weapon. Dr. McMaster concluded that the cause of Jerry Hopper's death was multiple gunshot wounds.

Dr. McMaster testified that she also performed the autopsy on David Gordon. Gordon had multiple gunshot wounds and injuries associated with the wounds. Although no exact number of wounds could be determined, Gordon had been shot at least thirteen times. He had wounds to his right thigh, right forearm, right lower abdomen, right and left sides of the torso, buttocks, and left hip. The projectiles recovered from these wounds were consistent with a 7.62 millimeter round. Dr. McMaster concluded that the cause of Gordon's death was multiple gunshot wounds.

Sergeant Mike Turner of the Jackson Police Department testified that he collected evidence from the red Mazda pickup truck. Among the items he recovered were: a loaded Norinco SKS 7.62 assault rifle with twenty-six rounds in the magazine and one in the chamber; a black bag containing a large quantity of assorted ammunition; a loaded Mossberg twelve-gauge shotgun with two rounds in the magazine and one in the

chamber; loose ammunition; a 7.62 magazine with fourteen rounds of ammunition; two spent 7.62 casings; and a .38 special caliber Winchester spent casing.

Agent Cathy Ferguson of the Tennessee Bureau of Investigation (TBI) testified that, on January 11, 2005, she was employed as a violent crimes investigator with the Jackson Police Department. She said she responded to the scene at the TDOT garage and was directed to the crow's nest area where she found Mrs. Jordan lying in a large pool of blood that contained brain matter. Realizing that she could not help Mrs. Jordan, Ferguson assisted with the CPR on Jerry Hopper. Ferguson subsequently recovered evidence found inside the crow's nest and outside the garage, including nine-millimeter and 7.62 shell casings, bullet fragments, and a note on which Grimm had written Defendant's license tag number. She said that fifteen 7.62 shell casings were recovered from the exterior crime scene and four from inside the crow's nest. Nine nine-millimeter shell casings and one live nine-millimeter round were found inside the crow's nest.

TBI Agent Scott Lott testified that he and other agents executed a search warrant at Defendant's house on January 11, 2005. Among the items recovered were: a Thompson Center Firearms .50 caliber muzzle loader, a Montgomery Ward 30/30 rifle, a Remington 20-gauge pump shotgun, a Remington 30.06 rifle, a Remington Caliber .243 rifle, a Ruger .22-caliber rifle, a Savage Firearms .22-caliber rifle, a Ruger .44 magnum rifle, a Springfield .410-gauge shotgun, a Pioneer 750 .22-caliber rifle, a Bauer Firearms .25-caliber automatic handgun, a .38 Special revolver, five live rounds of Winchester .38 Special ammunition, and a trigger group assembly.

TBI Agent Shelly Betts, accepted by the trial court as an expert in ballistics, testified that she examined evidence collected in this matter, including a 12-gauge shotgun, a Norinco SKS rifle, a Star .45-caliber semi-automatic pistol, and an Inter Arms Star nine-millimeter semi-automatic pistol. She said that the safety feature functions on the SKS rifle had been converted to fire in fully automatic mode, rather than the semi-automatic mode, which was how it had been manufactured to function. She explained that several modifications had been made to the rifle's trigger housing assembly, causing the weapon to fire continuously once the trigger was pulled. Agent Betts tested several cartridge cases recovered from the crime scene and determined that they had been fired from the SKS rifle. Additionally, she tested nine-millimeter cartridge cases recovered from the interior crime scene and determined that they had been fired from the Star nine-millimeter pistol. She examined bullet fragments recovered from David Gordon's right thigh and determined that one had "conclusively been fired through the barrel of the SKS rifle." Agent Betts further determined that some of the fragments recovered from Gordon's right hip and abdomen had been fired through the barrel of the SKS rifle. She also examined nine-millimeter projectiles recovered from Jerry Hopper's back and pelvis and determined they had been fired from the Star nine-millimeter pistol. Her examination

of the nine-millimeter projectiles recovered from Renee Jordan's leg and uterus revealed they had been fired from the Star nine-millimeter pistol. Agent Betts said that the nine-millimeter projectile recovered from Mrs. Jordan's brain had "probably" been fired from the Star pistol. Fragments recovered from Mrs. Jordan's liver and chest were conclusively identified to the SKS rifle. Agent Betts explained that the 7.62 rounds found in the bodies of Mrs. Jordan and David Gordon were hollow point bullets, meaning that as soon as they struck the skin they fragmented into numerous pieces. She examined the 7.62 magazine found inside Defendant's truck and described it as "an SKS-type detachable magazine that would function in this SKS rifle, and it holds approximately 31 rounds."

Madison County Sheriff's Department Sergeant Chad Lowery testified that, shortly after Defendant was apprehended, he went to Defendant's home to check on the welfare of any children who may have been at the home, but no children were present when he arrived. Sergeant Lowery discovered a loaded pistol on top of the refrigerator and saw several other weapons in the home. On the kitchen counter, Sergeant Lowery observed a handwritten note, which stated: "Renee got what she deserved. Bitch. I'm sorry. I love you. Thanks for being so good to me. Love you Shelby, Sydney, Deanna. Thanks, Mom and Dad. You did all you could." On cross-examination, Sergeant Lowery acknowledged that, during Defendant's apprehension, he "smelled alcohol, or what [he] thought to be alcohol" on Defendant.

**Defense Proof**

Jackson Police Investigator Tyreece Miller testified that he interviewed Defendant at approximately 3:35 p.m. on the day of the shooting. Defendant waived his right to an attorney and volunteered to speak with Investigator Miller. During their conversation, Defendant asked how many people he had shot and if Mrs. Jordan was dead. Defendant provided a urine sample and consented to give a blood sample which was drawn at approximately 9:50 p.m. Defendant said he had consumed approximately five shots of vodka but "was not under the influence." Defendant also provided the following statement to Investigator Miller:

> I've been married to Renee Jordan for five years. She has a son named Tyler Surratt. He is my stepson. She has a daughter named Sydney Jordan. She is my daughter also by Renee. I have three others by two other women who are my former wives. Back in the summer 2002, Renee's son Tyler molested my daughter, Shelby Jordan. He was 10 years old and she was 8 years old at the time. [Department of Children's Services] was involved, and Tyler had to go to counseling. On December the 11th, 2004, Tyler was in Lindsey's bedroom. He was lying on his back and he had

14

something in his hand.  He was playing with Lindsey.  He was trying to let her get whatever it was out of his hand, but he had a tight grip on it.  She was reaching for it.  He would let her grab his hand, and then he would pull her across his body.  He didn't know it, but I was watching him.  It looked like he was pulling her across his penis.  I saw him do this three times before I stopped him.  I went in the room.  I cursed him.  I told him that I was going to stick my foot up his ass if he ever touched one of my daughters again.  I left and went deer hunting.  When I got back, Renee was on the phone with some man.  My mother showed up, and Renee left and never came back home.  We did spend Christmas Eve, New Year's Eve and this past Sunday night together.

Back in September 2004, Renee started having an affair with Johnny Emerson.  He works in a building where she works.  He works in the shop and Renee works in the office. . . . I found out about their affair in October.  She admitted to it and I forgave her.  This morning I woke up and had no intentions of hurting Renee.

She called me from work.  I was at home.  She was acting like a bitch.  I had been begging and bending over backwards to make this work up to this point.  She unexpectedly told me that me and my daughters from another marriage have until the first of February to get out of her house.  She said that she was going to see her lawyer tomorrow and she was going to have me evicted. . . . Renee hung up on me before I had a chance to say a word.  This made my blood boil.  I started loading my guns.  I loaded my 12-gauge shotgun, a Star .45 caliber semi-automatic handgun and an SKS fully automatic rifle with a folding stock.  I put a 33-round clip in it.  I left a note on the counter stating that if something happens to me, I love my mother, father and four daughters.  I didn't know if I was going to do anything to Renee or not.  I was thinking more of killing myself.

I got in my 1991 Mazda truck, red, and I was going to Renee's workplace at TDOT.  On the way there I broad-sided a green four-door vehicle.  I was going down Anglin Lane.  I was driving fast and couldn't stop soon enough.  I T-boned the green car that was going down Lower Brownsville Road.  I didn't stop.  I went on up to TDOT.  I pulled up to where Renee works.  I left the 12-gauge and the SKS in the truck.  I had the .45 in a holster on my hip, the nine-millimeter was in my back.

I walked in the office.  Renee said, "What the fuck are you doing here?" She was sitting in the chair at her desk.  I didn't say a word to her.  I

15

pulled out the .45 and I shot her in the leg. I shot her in the leg because I wanted her to look at me. She hollered. The guy that was sitting in the corner got up and came at me. I shot him and he fell to the floor. I think he was James Goff, but I'm not sure. I heard him moaning. Larry Taylor was in the office. I patted him on the back with the pistol and told him that he needed to get out of there. He left. I looked back at Renee, and she was already dead I think. I can't remember if I had shot her more than just in the leg. I remember the last time that I shot her was in the top of the head with the .45. I didn't want to shoot her in the face.

I walked back out to my truck and I saw the guy in the green car that I had hit. He was parked behind me. I got in the truck. He was pointing his finger and coming at me. I grabbed the SKS and I fired it at him. He went to the ground. I don't remember going back to the office with the SKS, but if there was a shell casing there, I must have fired it in the office. I got in my truck and left. I had intentions of killing myself when I got back home, but the police hit me head on.

I have made this statement openly and freely. I have not been promised anything, and I have not been threatened in any way. I am sorry that this happened. Renee didn't deserve to die.

TBI Special Agent John W. Harrison testified that he analyzed the urine and blood samples submitted by Defendant. The result of the blood sample, taken at 9:50 p.m., was "no alcohol present." Agent Harrison agreed that if a person consumed five shots of vodka in the early morning hours but did not give a blood sample until 9:50 p.m., the alcohol could have metabolized by that time. He explained that if a person consumed five shots rapidly within an hour, the person's blood-alcohol level would be approximately .10%, but about five hours later, the level would be down to 0. The result of the urine sample, taken at 3:35 p.m., was .17%. However, Harrison said not much significance should be attached to that result because it did not indicate how much Defendant had had to drink. He acknowledged that all the urine sample really revealed was that, sometime prior to the collection of the sample, there had been alcohol in Defendant's bloodstream. Pursuant to the TBI's normal operating procedure, the samples were preserved "for a period of time and then destroyed."

TBI Agent Kelly Hopkins testified that she performed a drug screen on the urine and blood samples submitted by Defendant. The urine sample was positive for Citalopram, an antidepressant, and benzodiazepines, which include antidepressant and anti-anxiety medications, such as Xanax. The blood sample was positive for Citalopram but negative for benzodiazepine. Agent Hopkins explained that, after a drug is ingested,

16

it first goes into the person's bloodstream and is later metabolized in the urine. She said that the blood sample was destroyed on January 3, 2006.

Officer Tikal Greer of the Jackson Police Department testified that when he and Officer Anderson transported Defendant to the Criminal Justice Complex, he noticed a strong odor of alcohol on Defendant's person. Defendant told the officers that "his wife was dead, full of holes" and that she had driven him crazy by "fucking around on him." Defendant also said that "he hated [that] people got in the way" and that his wife "got a taste of his .45 and her brother's gun." Once they arrived at the Criminal Justice Complex, Defendant admitted "to killing or hurting four people."

Sergeant Marneina Murphy of the Madison County Sheriff's Department testified that she supervised Defendant's booking process at the jail. She estimated that she was around the defendant for thirty minutes to one hour and described his demeanor as "more confused, maybe not focusing, probably dazed a little bit." She acknowledged that another officer asked Defendant the questions on the intake questionnaire.

Dr. Dennis Wilson, a clinical psychologist, testified that he evaluated Defendant, meeting with him on four different occasions beginning on October 12, 2005, for a total of eleven hours. He conducted clinical interviews, IQ testing, and some brief personality testing. Dr. Wilson determined that Defendant was competent to stand trial and that a defense of insanity was not available. However, in Dr. Wilson's professional opinion, Defendant "lacked substantial capacity when the crimes were committed," meaning Defendant was "unable to exercise restraint or judgment" and "unable to reflect or premeditate."

In formulating his opinion, Dr. Wilson discovered that Defendant was brought up in a stable family. His parents were good parents and were active in the community. Dr. Wilson opined that Defendant was determined to set up a loving, stable environment for his children whom he clearly loved. Dr. Wilson also noted that Defendant had been divorced twice and suffered from depression and anxiety. He was prescribed Prozac in his early twenties. Defendant began self-medicating with alcohol and drugs, including methamphetamine and crack cocaine. In 1986, Defendant was injured in a car accident. He had a broken back and ribs and injuries to his knee, ankle, and pelvis. He developed chronic headaches and various pains. Beginning in 1996, he was prescribed narcotic medications, including hydrocodone, oxycodone, Vicodin, Lortab, and Darvocet. In 2000, Defendant was prescribed Xanax, an anti-anxiety medication, and Ambien, for insomnia. Defendant, at various times, was given other medications for depression and agitation.

17

At the time of his marriage to Mrs. Jordan in 2000, Defendant had stopped using illegal drugs and "became a regular moderate beer drinker" that "would qualify for a diagnosis of alcoholism." Their daughter Sydney was born in late 2001. At this time, Defendant's previous wife was using drugs and neglecting their two daughters. Defendant and Mrs. Jordan began trying to get custody of Shelby and Lindsey. Their marriage began to deteriorate, however.

The couple attended marriage counseling. In September 2004, they got custody of Shelby and Lindsey. Later, Mrs. Jordan told Defendant that she desired other male companionship and, in October 2004, she started going to bars, staying out late, and coming home intoxicated. Mrs. Jordan also told Defendant about her relationship with a male co-worker and said she wanted to have sex with this co-worker. Divorce was imminent, and Defendant's family structure was crumbling. During this time, Mrs. Jordan continued her intimate relationship with Defendant but also shared the details of her encounters with other men with him. Defendant was confused and upset about her extramarital activities. Defendant's doctor doubled his dose of Xanax on January 4, 2005. Mrs. Jordan then gave Defendant a deadline of February 1 for him and his two daughters to move out of the house. Dr. Wilson opined that this was the end of whatever was left of Defendant's dream of creating a happy home for his children.

Dr. Wilson further testified that on the date of the shooting, Defendant drank alcohol and had not slept for three days. His world had collapsed, and he could no longer control his behavior. Defendant started talking to himself. People observing Defendant after the shooting described him as being "out of it." Defendant expressed remorse over the incident and cooperated with the authorities. Dr. Wilson concluded:

> [Defendant] has a major depressive disorder, recurrent episodes. It was moderate over his lifespan. He had generalized anxiety disorder, alcohol abuse and a borderline personality disorder. This is by definition someone who has a hard time maintaining interpersonal relationships, dealing with problems, coping with stress. He just never was any good with any of that stuff. At the time of the crime, it is my opinion that he was intoxicated with alcohol, and it is my opinion, I believe, that he was also intoxicated with anxiolytics which was the Xanax. These two drugs, alcohol and the Xanax, potentiate each other, and anything can happen if you take both of those things together. . . . [T]hey sort of multiply each other. They can easily do brain damage.
>
> . . .

18

[D]issociative disorder is when . . . [t]here's a disruption in the usually integrated functions of consciousness, memory or perception of the environment. That's from the Diagnostic & Statistical Manual.

. . .

You also have symptoms of what we call derealization. That's as if you're detached and you're an outside observer. It's like you're watching someone else do it.

. . .

I don't think he was in control of his faculties when all this happened. I don't know if it was from the stress, from the depression, the anxiety, the dissociation, the intoxication, or, most likely a combination of all of the above.

Dr. Wilson opined that Defendant was substantially impaired to the extent that he was unable to form premeditation.

Asked on cross-examination if Defendant was in control at the time of the shooting, Dr. Wilson said that Defendant "was in control sometime before the crime and he became in control again after the crime, but during the crime he was not. I'm not sure. It's a gray area, a gradual change. I just don't know." Dr. Wilson opined that Defendant was not capable of forming intent at the time of the shooting. He said that Defendant "knew the difference between right and wrong. He was not insane. He was just incapacitated." Dr. Wilson explained that Defendant's "behavior was inconsistent and out of control. He was in and out of consciousness there. He knew some things, remembered some things and not others, but I don't think he was at all in control the whole time."

**Rebuttal Proof**

In rebuttal, the State recalled Investigator Tyreece Miller. Miller reiterated that, at the time Defendant gave his statement, Defendant said he had been drinking but was not under the influence of any drugs or alcohol. He said that Defendant walked steadily, was able to answer the questions he asked, and was "very coherent." Miller said that Defendant did not appear to be under the influence of drugs or alcohol. Defendant consented to give a urine sample but initially refused to provide a blood sample because he did not like needles.

19

Following the department's standard operating procedures, Miller wrote down Defendant's statement as he talked and allowed him to review it before he signed it. Asked if Defendant made any additional comments that were not included in his statement, Miller said Defendant told him, "Today is Renee's father's birthday. I guess I gave him a hell of a birthday present." According to the driver's license belonging to Mrs. Jordan's father, his date of birth was January 11, 1932. Miller asked Defendant if he could include the birthday present comment in the statement, but Defendant said, "I don't want that in there." Defendant also told Miller, "[Mrs. Jordan] was in a pool of blood the last time that [he] shot her."

On cross-examination, Investigator Miller said that Defendant signed a waiver of his rights at 3:50 p.m. and signed his statement at 5:35 p.m. Defendant eventually gave his consent for a blood sample at 9:50 p.m. Miller acknowledged that a Breathalyzer test was not performed on Defendant and that Defendant told him he was taking medication. Miller said that although the police department had video equipment, he did not have it brought to the Criminal Justice Center to videotape Defendant's interview because it was against departmental policy and not standard operating procedure. Miller said he was not aware of the availability of any video equipment in the booking area of the Criminal Justice Center.

Dr. Daryl Matthews, a forensic psychiatrist, testified that he evaluated Defendant on April 24, 2006. Dr. Matthews spent approximately six hours with Defendant, during which he conducted a psychiatric interview and a mental status evaluation. As a result of his examination of Defendant, Dr. Matthews did not find a severe mental disorder and said, "I don't believe [Defendant] has ever had a severe mental disorder." Dr. Matthews concluded that Defendant "was able at the time of the offense . . . to act intentionally and to act with premeditation." He added that Defendant was able to conform his behavior to the requirements of the law.

In reaching his determination that Defendant had the capacity to premeditate, Dr. Matthews said he reviewed, among other things, the note Defendant wrote, the recorded messages Defendant left on Mrs. Jordan's cellular telephone, the statements of various witnesses at the scene, and the police reports. The messages Defendant left on Mrs. Jordan's phone included sarcastic comments about her obtaining a restraining order and statements such as: "I hope you go to work tomorrow, bitch, 'cause you'll be there one day. It may not be tomorrow, but I will catch up with your raggedy ass. Your day is coming" and "Your ass is gonna pay." Dr. Matthews disagreed with Dr. Wilson that Defendant was dissociated at the time of the shooting, saying that dissociation is very common, mostly pertains to memory, and has nothing to do with intent or premeditation.

20

Among the witness statements Dr. Matthews reviewed was that of Paul Forsythe, which Dr. Matthews recited:

> The driver of the red truck told the driver of the green car to get out of here. The driver of the green car said, "No, you hit me."  The driver of the red truck folded the seat forward on the truck and he said, "You will."  He pulled out a black rifle with a silencer or something on the end of the barrel. He fired at the driver of the green car.

Dr. Matthews also recited from the statement of George W. Bond, Sr.: "The man with the gun was white.  He looked up and saw me and shook his head as if to tell me he didn't want me involved."  Dr. Matthews said that Defendant's statement to Sergeant Johnny Briley, "Renee fucked me over, Johnny," showed that Defendant recognized Briley and indicated the "intactness of his mental capacity."  Dr. Matthews read from the statement of Freddie Ellison:  "When I saw [Defendant], he had a gun and was trying to hide it.  I said, 'David, what are you doing?'  He said, 'Just go on.'  I said, 'What's the matter?  He said, 'Just go on.'"  Dr. Matthews said that Defendant's ability to recognize someone he knew at the scene, Freddie Ellison, implied that he "had the ability in memory to keep in mind people that he knew, and most importantly . . . he had the ability not to . . . shoot Mr. Ellison."  Dr. Matthews concluded that Defendant was making choices and able to control himself at the time of the shooting.

## Verdicts

The jury convicted Defendant of the first degree premeditated murder of Renee Jordan, the first degree premeditated murder of Jerry Hopper, the first degree felony murder of Jerry Hopper, the first degree premeditated murder of David Gordon, the first degree felony murder of David Gordon, the attempted first degree murder of James Goff, the aggravated assault of James Goff, the attempted first degree murder of Larry Taylor, the aggravated assault of Larry Taylor, and leaving the scene of an accident.  The trial court merged the convictions for the felony murder and premeditated murder of Jerry Hopper into a single conviction for first degree murder and, similarly, merged the convictions for the felony murder and premeditated murder of David Gordon into a single conviction for first degree murder.  The court also merged the two aggravated assault convictions with the two attempted first degree murder convictions.

## Penalty Phase

Donald Roberson, Renee Jordan's father, testified that she was the youngest of his three children; his only daughter; and his last living child.  One son died of cystic fibrosis when he was seven years old, and the other son died at age thirty-three.  Roberson related

that Renee's daughter, Sydney, was four years old at the time of her mother's death and that he and his wife currently had custody of her. He said that Sydney still asks for her mother. Since Renee's death, Roberson has experienced "attacks, anxiety and depression." Roberson added that Renee was murdered on his birthday, and he is no longer able to celebrate his birthday.

Robert E. Lee Gordon, Jr., David Gordon's older brother, testified that he and David had two other brothers, both of whom were deceased at the time of David's death. Gordon, Jr. explained the impact of the death of his last remaining brother on him and his family. He said that he has difficulty sleeping and that his brother's death is "all I think about, the way he died." One of David's sons was in college and the other in high school, but both gave up on school as a result of their father's death. Gordon, Jr. said he had buried two brothers and his mother in the past two years. He related that David was a hard worker, a good father, and "very well respected . . . a fine man."

Shane Gordon, the eighteen-year-old son of David Gordon, testified that he was a junior in high school when his father was killed. He said that he thought about his father's death "all the time and it gets me down. . . . It's just something that's hard to deal with." He said that his father was a hard worker and was kind to everyone.

Renee Dawson testified that David Gordon was her fiancé and best friend. On the date of his murder, Ms. Dawson and Gordon had a lunch date planned. The couple had moved into a new home together on Thanksgiving Day, but Ms. Dawson was unable to keep the home after Gordon's death. Ms. Dawson stated, "I would say that my life is empty and my life ended that day as well."

Emma Hopper, the wife of Jerry Hopper, testified that they had been married twenty-nine years. She explained that losing her husband was like "losing half of myself." Mr. Hopper worked for the Tennessee Division of Forestry and had been a state employee for twenty-eight years. At the time of his murder, Mr. Hopper had been making plans for retirement. Mrs. Hopper explained that the couple planned on spending more time with their young granddaughter, who was eighteen months old at the time of Mr. Hopper's death. She said that she had not been able to spend a single night in their home since his death and had been living with her daughter and her family. Mrs. Hopper testified that her granddaughter still asks, "Where is my papaw?"

Misty Ellis, the daughter of Jerry Hopper, testified that she had worked with victims of crimes in the past. She described her experience dealing with her father's death as an "[a]bsolute nightmare." Ellis said that it was "just torture" to know that one day she would have to explain to her daughter why her grandfather was no longer here.

TBI Agent Cathy Ferguson identified photographs of the victims. Exhibit 179 was a photograph of James Goff depicting the bullet wound to his abdomen. Exhibit 180 was a photograph of James Goff depicting the bullet wound to his neck. Exhibits 181 and 182 were photographs of Larry Taylor depicting the gunshot wounds to his legs. The photographs of Goff and Taylor were taken at the emergency room. Exhibit 183 was a photograph depicting Renee Jordan as she was found in the crow's nest at the TDOT garage.

Dr. Amy McMaster testified that Dr. Staci Turner performed the autopsy on Renee Jordan. Identifying exhibit 184 as a photograph depicting a gunshot wound to Mrs. Jordan's forehead, Dr. McMaster stated that the wound was inflicted from a "close range." She explained that it was "a close range wound because there's soot," or burnt gunpowder, on the skin surrounding the wound. She said that the wound to the forehead was a fatal wound. The autopsy further revealed a gunshot wound to the back of Mrs. Jordan's head, which went through her head and exited on her face. Exhibit 185 was a photograph depicting the gunshot wound to the back of the head. Dr. McMaster stated that this wound also would have been fatal. Dr. McMaster also identified nine entrance wounds on Mrs. Jordan's torso. She stated that there was significant injury to the abdominal area, which was a potentially fatal wound. Dr. McMaster said that this wound would have been painful. She explained, "in general terms, the body has about 30 seconds' worth of reserve of oxygen in the brain. So assuming your heart stops immediately, you've got about 30 seconds left of oxygen in your brain that will allow you to remain conscious." She affirmed that, during this time, one could experience pain. She added that, depending on other factors such as adrenaline, this time period could be longer. Dr. McMaster additionally stated that the wounds to Mrs. Jordan's body were from two different caliber bullets and agreed that the wounds were "beyond that which was necessary to inflict death." On cross-examination, she admitted that there was no indication in the autopsy report of post-mortem wounds.

Regarding the autopsy of Jerry Hopper, Dr. McMaster testified that he had two gunshot wounds to his abdomen, which injured segments of bowel and also segments of the aorta. Dr. McMaster stated that these wounds would not have been immediately fatal but would have been painful. Hopper also sustained a gunshot wound to his right wrist. Dr. McMaster was unable to determine the order in which the wounds were inflicted.

Dr. McMaster testified that she performed the autopsy on David Gordon. Gordon had "at least 13 entrance wounds" which were inflicted from the front, the side, and the back of the body. Gordon sustained injury to his bowel area, specifically, the natal cleft. The wounds sustained to the buttocks and natal cleft could be consistent with Gordon being face-down on the pavement. She opined that the number of wounds were more

23

than that necessary to cause death. She added that the wounds would have been painful and that Gordon would have eventually lost consciousness.

In mitigation, Defendant presented the following testimony. Larry Jordan, Defendant's younger brother, testified that, during their childhood, he and Defendant played ball and went fishing and hunting. Their father was their Little League coach. Jordan stated that he would be devastated if his brother was sentenced to death. He added that, if his brother received a sentence of life without parole, he would maintain his relationship with him. Jordan testified that Defendant has a close relationship with his four daughters.

Suzie Silas, a guidance counselor at Malesus Elementary School, testified that Defendant had obtained custody of Shelby and Lindsey, his daughters from a previous marriage. She characterized Defendant as a concerned parent and said that he regularly checked on his children. After Defendant was incarcerated, Lindsey wrote a letter expressing her desire to spend a day with Defendant because "I miss my daddy very much." Ms. Silas also received a letter from Defendant after his incarceration, thanking her for helping his children.

Michael Lee Merriwether testified that he met Defendant while incarcerated at the Criminal Justice Complex. He stated that he and Defendant often read Christian literature. Merriwether added that it was a benefit to him to have this interaction with Defendant. He opined that Defendant has the ability to do some good while in jail, including ministering to others.

Cheryl Fisher testified that she dated Defendant before his marriage to Renee Jordan. They remained friends after their romantic relationship ended. She opined that, if Defendant received a sentence of life, his children would benefit. She explained that Defendant was a very good father and that his children idolized him. Ms. Fisher related how Defendant's children were having difficulty rationalizing the potential punishment of death.

Madison County Deputy Andre Denice Hays, a jailer at the Criminal Justice Complex, testified that she had frequent contact with Defendant and described him as quiet and polite. Deputy Hays opined that Defendant would make a good prisoner and would be able to serve a sentence of life without parole without being a risk to any prisoner, guard, or other human being.

Sergeant Neina Murphy, also assigned to the Criminal Justice Complex, testified that she had not had any problems with Defendant since his incarceration. She affirmed that Defendant had not demonstrated to her that he would be a threat to any prisoner,

guard, or other human being. She added that she would be disturbed if Defendant received the death penalty.

Madison County Deputy Jason Walker, a jailer at the Criminal Justice Complex, testified that Defendant often mentioned his family. Deputy Walker stated that Defendant's demeanor was pleasant, he never complained, and he did what he was told to do. He described Defendant as one of the better inmates. Deputy Walker opined that Defendant would make a good prisoner in the penitentiary and would not be a threat to other individuals.

Deanna Jordan, Defendant's oldest daughter, testified that she was a junior at Freed-Hardeman University. She said that she had three sisters, Lindsey, Shelby, and Sydney, and that they all loved their father and knew that he loved them. She stated that, while her father will not be able to walk her down the aisle, she would like for him to be able to meet his grandchildren some day. She stated that she wanted Defendant to have a part in their lives, even if it was just visitation.

Dr. Dennis W. Wilson made a PowerPoint presentation to demonstrate the psychological point of view of the mitigating factors. He explained that Defendant started life in a stable and loving family but later suffered from depression, anxiety, and insomnia. He stated that Defendant began using drugs and alcohol. Dr. Wilson spoke of Defendant's two failed marriages before marrying Renee. He mentioned Defendant's four children. He described Defendant's health problems and prescription medications. Dr. Wilson testified regarding the disintegration of Defendant's marriage to Mrs. Jordan. He said Defendant took too much Xanax, drank vodka, lost control, and "fell apart."

Dr. Wilson also described Defendant's remorse expressed very soon after the incident. He verified Defendant's status as a model prisoner. He added that Defendant was fully aware that he will spend the rest of his life in prison. Dr. Wilson opined that the structured setting of incarceration was good for Defendant because the stressors of every day life were gone. Defendant had adjusted well to the environment. Dr. Wilson added that Defendant had been a loving and active father.

Dr. Wilson provided his opinion as a clinical psychologist:

[Defendant] was under a lot of stress. He has a long history of not being able to deal with stress or change, and he was disturbed at the time of this crime.

And t[o]o, he was impaired also due to that chronic depression and anxiety, plus the intoxication. He just wasn't used to drinking that much.

25

He took the Xanax in an attempt to try to sleep or calm down. He wasn't trying to get intoxicated, but the net effect was that he became impaired.

. . .

Confinement is -- No one will ever have to worry about him doing something like this ever again, and even inside the prison system, he's likely to have a calming effect. . . . And importantly, he will be punished for what he did.

Gary Morris, the pastor of Bemis United Methodist Church, testified that Defendant's parents were members of his congregation. Since the incident, Morris had visited Defendant at the jail between thirty-five and fifty times. He recalled that, the day after Defendant's arrest, Defendant appeared dazed and confused. Defendant was very tearful and emotional and asked Morris to attend Mrs. Jordan's funeral. Morris stated that Defendant had expressed his repentance and remorse. He added that it would be devastating to the family if Defendant received a sentence of death.

At the close of the proof, the trial court instructed the jury on the following statutory aggravating circumstances:

Number 1: The Defendant knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder. That aggravating circumstance could possibly apply to Count 1, 2 or 3.[5]

Number 2: The murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Counts 1, 4 or 5 possibly.[6]

Number 3: The murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the Defendant or another. Consideration of Counts 2, 3, 4 and 5.

---

[5] Count One referred to the premeditated murder of Mrs. Jordan, Count Two referred to the premeditated murder of Mr. Hopper, and Count Three referred to the felony murder of Mr. Hopper.

[6] Count Four referred to the premeditated murder of Mr. Gordon, and Count Five referred to the felony murder of Mr. Gordon.

Number 4: The murder was knowingly committed, solicited, directed or aided by the Defendant while the Defendant had a substantial role in committing or attempting to commit first degree murder. Knowingly means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. The requirement of knowingly is also established if it is shown that the Defendant acted intentionally.

Intentionally means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the results.

That one is for consideration on Counts 1 through 5.

Number 5: The Defendant committed mass murder which is defined as the murder of three or more persons, whether committed during a single criminal episode or at different times within a 48-month period. For consideration of Counts 1 through 5.

Number 6: The Defendant knowingly mutilated the body of the victim after death. For consideration in Count 1.

See generally Tenn. Code Ann. § 39-13-204(i)(3), (5), (6), (7), (12), (13) (2003). The trial court additionally instructed the jury as to applicable mitigating circumstances as follows:

Tennessee law provides that in arriving at the punishment, the jury shall consider . . . any mitigating circumstances raised by the evidence which shall include but are not limited to the following:

Number 1: The murder was committed while the Defendant was under the influence of extreme mental or emotional disturbance.

Number 2: The capacity of the Defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment.

27

Number 3: The Defendant has adjusted well to the structure of prison life.

Number 4: The Defendant has expressed remorse, has accepted responsibility for his actions and is willing to accept punishment for his crimes.

Number 5: The Defendant has a loving and supportive family.

Number 6: Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing. That is, you shall consider any aspect of the Defendant's character or record or any aspect of the circumstances of the offense favorable to the Defendant which is supported by the evidence.

See generally Tenn. Code Ann. § 39-13-204(j)(2), (8), (9). After receiving further instructions from the court, the jurors retired from open court to begin their deliberations at 8:05 a.m. They returned with their verdict at 3:30 p.m.

As to the first degree murder of Renee Jordan, the jury returned a verdict of death, finding that the State had proven the following statutory aggravating circumstances beyond a reasonable doubt:

Number 1: That the Defendant knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder.

2: The murder was especially heinous, atrocious or cruel [in] that it involved torture or serious physical abuse beyond that necessary to produce death.

4: The murder was knowingly committed, solicited, directed or aided by the Defendant while the Defendant had a substantial role in [committing] or attempting to commit that first degree murder.

. . .

5: The Defendant committed mass murder which is defined as the murder of three or more persons, whether committed during a single criminal episode or at different times within a 48-month period.

28

And 6: The Defendant knowingly mutilated the body of the victim after death.

The jury further found that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

As to the first degree murder of Jerry Hopper, the jury returned with a verdict of death, finding that the State had proven the following statutory aggravating circumstances beyond a reasonable doubt:

1: The Defendant knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder.

3: The murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the Defendant or another.

4: The murder was knowingly committed, solicited, directed or aided by the Defendant while the Defendant had a substantial role in committing or attempting to commit first degree murder.

. . .

5: The Defendant committed mass murder which is defined as the murder of three or more persons, whether committed during a single criminal episode or at different time[s] within a 48-month period.

The jury further found that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

As to the first degree murder of David Gordon, the jury returned with its verdict of death, finding that the State had proven the following statutory aggravating circumstances beyond a reasonable doubt:

2: The murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.

3: The murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the Defendant or another.

29

4: The murder was knowingly committed, solicited, directed or aided by the Defendant while the Defendant had a substantial role in committing or attempting to commit first degree murder.

. . .

5: The Defendant committed mass murder which is defined as . . . [the murder of] three or more persons, whether committed during a single criminal episode or at different times within a 48-month period.

The jury further found that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

A sentencing hearing on the noncapital offenses was held at a later date. At the conclusion of that hearing, the trial court imposed a twenty-five-year sentence for each of the attempted first degree murder convictions (Counts 6 and 8); a six-year sentence for each aggravated assault conviction (Counts 7 and 9); and a thirty-day sentence for leaving the scene of an accident (Count 10). The trial court merged Counts 6 and 7 and Counts 8 and 9. The court ordered that the two twenty-five-year sentences be served consecutively to each other for an effective sentence of fifty years.[7]

On direct appeal, the Court of Criminal Appeals affirmed Defendant's convictions and sentences.

## ANALYSIS

### I. Application of Tennessee Rule of Evidence 615 in Capital Trials

Prior to trial, the defense filed a motion requesting the trial court to allow "those persons who are friends and/or family of Defendant that will only be testifying at the sentencing hearing, be allowed to remain in the Courtroom for the entire trial." The State opposed the motion on the basis of Tennessee's rule of witness sequestration, see Tenn. R. Evid. 615, and asserted that the defense had not demonstrated that the presence of any of Defendant's friends or family members were essential to the presentation of his defense. Tennessee Rule of Evidence 615, often referred to simply as "the rule," provides as follows:

---

[7] The thirty-day misdemeanor sentence was ordered to be served concurrently with "all counts."

Exclusion of witnesses. – At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

Tenn. R. Evid. 615. The trial court denied the defense motion after a hearing on the basis that there was "no authority" supporting the motion, explaining that Rule 615 and the statute governing capital sentencing, Tenn. Code Ann. § 39-13-204(c), "specifically name[] those persons who may be excluded from the general rule of sequestration." Those persons are "members, or . . . representatives of the victim's family." Tenn. Code Ann. § 39-13-204(c).

Approximately one month later, the defense filed a "renewed and amended" motion to allow Defendant's family to remain in the courtroom during the trial. The defense reiterated that Defendant's family members would not be called as witnesses during the guilt/innocence phase of the trial, but would be called only if a sentencing phase was necessary. The defense pointed out that relevant mitigating evidence was admissible in a capital sentencing hearing even if in conflict with Tennessee's Rules of Evidence. See id. The State opposed the motion. After a hearing, the trial court denied the motion, stating that Defendant "failed to establish that the presence of the Defendant's family was essential to his defense and that therefore the requirements of Tennessee Rule of Evidence 615 were not met."

At trial, the rule was requested and imposed. The trial court instructed "[e]veryone that is a witness in this case, unless they have been predesignated by the State and defense to remain in, . . . you are to remain outside." In accordance with the trial court's pre-trial rulings and imposition of the rule, Defendant's younger brother Larry and his eldest daughter Deanna elected not to attend the trial; they were subsequently allowed to testify at the sentencing hearing. Defendant's parents chose to remain in the courtroom during

31

the trial and therefore were not permitted to testify at the sentencing hearing.[8]   The defense informed the trial court during the sentencing hearing that, "had they testified, they would have indicated that they love their son, that they would be devastated at a sentence of death and basically just other things about the family relationship."

On appeal, the Court of Criminal Appeals determined that Defendant was not entitled to relief on this basis.  The applicability of Tennessee Rule of Evidence 615 to capital sentencing trials is an issue of first impression before this Court.

*A. Standard of Review*

We review a trial court's decisions about the admissibility of evidence for an abuse of discretion.  State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008).  "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." Id. (citing Konvalinka v. Chattanooga-Hamilton County Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

*B. The Rule*

Tennessee Rule of Evidence 615 codifies the long-established practice of sequestering witnesses during a trial so that they may not hear one another testify prior to testifying themselves.  Witness sequestration "is a concept integrally related to the notion that both parties to an adversarial proceeding are entitled to a fair hearing in the interests of justice."  Webb v. State, 766 S.W.2d 236, 239 (Tex. Crim. App. 1989).  According to one source, "[t]he history of the rule is traceable to the Biblical story of Susanna," Carlile v. Texas, 451 S.W.2d 511, 512 (Tex. Crim. App. 1970), and this Court has also dated the practice "from the days of Daniel," Nelson v. State, 32 Tenn. (1 Swan) 237, 257 (1852).[9] Indeed, this Court recognized many years ago that witnesses have been sequestered "[s]ince probably the beginning of time in the trial of cases."  Nance v. State, 358 S.W.2d 327, 329 (Tenn. 1962).

---

[8] Defense counsel informed the trial court that Larry and Deanna Jordan "were not present at the trial . . . because of the rule.  They were excluded and would have been available and happy and wanted to be able to attend the whole trial."  As to Defendant's parents, defense counsel stated that they "chose to be able to attend the trial."

[9] The story of the falsely-accused Susanna, who is saved from execution by Daniel's skillful cross-examination of her accusers, appears in the Book of Daniel in the Old Testament.  See http://www.internationalstandardbible.com/S/susanna-the-history-of.html (last visited Sept. 14, 2010).

The rule serves significant goals. First, preventing witnesses from hearing other witnesses testify before they, themselves, do "exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses." Geders v. United States, 425 U.S. 80, 87 (1976). Second, sequestering witnesses "aids in detecting testimony that is less than candid." Id. Third, "[s]equestering a witness over a recess called before testimony is completed serves . . . [to] prevent[] improper attempts to influence the testimony in light of the testimony already given." Id. See also Nance, 358 S.W.2d at 329 (observing that the rule of sequestering witnesses "is designed to detect falsehood as well as to prevent any witness from coloring his, or her, testimony either purposely or through influence by talking to other witnesses and hearing them talk"); Nelson, 32 Tenn. at 257 ("The practice of examining the witnesses separate and apart from each other, at the request of either party, is invaluable, in many cases, for the ascertainment of truth and the detection of falsehood."); State v. Warren, 437 So.2d 836, 839 (La. 1983) ("The purpose of sequestration is to assure that a witness will testify from his own knowledge of the case without being influenced by the testimony of prior witnesses, and to strengthen the role of cross-examination in developing the facts."). In short, the underlying purpose of sequestering witnesses is to preserve the credibility of their testimony in its pre-trial condition. Thus, a potential witness's violation of the rule should generally be considered in terms of the witness's credibility rather than in terms of his or her competency. See Williams v. State, 523 S.W.2d 377, 380 (Ark. 1975) ("[A] violation by a witness of the rule of sequestration of witnesses, through no fault of, or complicity with, the party calling him, should go to the credibility, rather than the competency of the witness."); Navarrete v. State, 656 S.E.2d 814, 820 (Ga. 2008) ("A violation of the rule of sequestration generally does not affect the admissibility of the testimony, but may impact on the credibility of the offending witness.").

Our current Rule 615 sets forth several specific exceptions to its application. First, parties who are natural persons may not be excluded from the courtroom while witnesses are testifying. Second, if a party is not a natural person but is, for instance, a corporation, the party's counsel may designate a natural person who may not be sequestered. Or, if the State is a party, the prosecuting attorney may designate a crime victim, a crime victim's relative, or an investigating officer as immune from sequestration. Tenn. R. Evid. 615 advisory comm'n cmts to 1997 amend. Third, "a person whose presence is shown by a party to be essential to the presentation of the party's cause" may not be excluded from the trial. Tenn. R. Evid. 615. The Advisory Commission Comments to Rule 615 explain that an example of this third exception "might be an expert witness a lawyer needs to help the lawyer understand opposing testimony" and add that "an expert witness who is to learn facts only through hearing testimony in court [also] could be allowed to sit in the courtroom under this [exception]." Indeed, this Court has previously recognized that

the dangers Rule 615 is intended to prevent generally do not arise with regard to expert witnesses in any proceeding. In fact, the rules of evidence provide that an expert witness may testify and base an opinion on evidence or facts made known to the expert *at or before* a hearing and the facts need not be admissible at trial. Moreover, an expert witness often may need to hear the substance of the testimony of other witnesses in order to formulate an opinion or respond to the opinions of other expert witnesses. In short, allowing an expert witness to remain in the courtroom as an "essential person" generally does not create the risk that the expert will alter or change factual testimony based on what is heard in the courtroom.

State v. Bane, 57 S.W.3d 411, 423 (Tenn. 2001) (citation omitted).

These exceptions to the general rule of sequestration illustrate the tensions between the underlying purpose of the rule and other, equally significant concerns. Thus, a party to the litigation will not be prevented from hearing testimony, even if he or she plans to testify and even though a party has the most incentive to tailor his or her testimony. Also, a witness who is expected to offer expert opinion testimony about facts testified to, as opposed to testimony about the facts themselves, is acknowledged to be outside the scope of the rule. Both exceptions make clear that the rule does not establish a concrete line which may never be crossed. Rather, as with other rules of evidence, there is latitude within which a trial court is expected to exercise its discretion. That discretion should be exercised with the aim of protecting the goals of the rule and should take into account the risk that the witness for which an exception is sought "will alter or change factual testimony based on what is heard in the courtroom." Id.; see also State v. Hill, 590 N.W.2d 187, 189 (N.D. 1999) (recognizing that sequestration's concern that a witness will otherwise tailor his or her testimony "'is justified . . . where "fact" or "occurrence" witnesses are called to testify'") (quoting United States v. Bramlet, 820 F.2d 851, 855 (7th Cir. 1987)).

*C. Sanctions for Violations of the Rule*

The case before us is unusual because, prior to trial, the defense sought and obtained an advisory ruling on the right of family members to testify during sentencing if they attended the guilt/innocence phase. More frequently, the rule is tested when a party seeks to call to the witness stand a person who has remained in the courtroom after the rule was invoked. In criminal prosecutions, the trial court's response typically results in one of two appellate issues: (1) the defense complains that the trial court permitted a prosecution witness to testify despite his or her violation of the rule; and/or (2) the defense complains that the trial court did not allow a defense witness to testify because he

or she violated the rule. See Webb, 766 S.W.2d at 239-40. In this case, we consider the second of these issues.

Initially, we recognize that the defense in this case did not actually call Defendant's parents to the stand during the sentencing hearing. The State argues to this Court that, accordingly, the trial court did not actually "exclude" their testimony. We are not persuaded. The defense twice raised and attempted to resolve this issue in its favor prior to trial. The trial court ruled against the defense both times. The issue was thus adequately preserved. It was not incumbent upon the defense to risk displeasing the trial court by calling witnesses that the trial court had already ruled would not be allowed to testify. The effect of the trial court's two pre-trial rulings was to require Defendant to choose which family members could support him by their presence during his trial, knowing that the testimony of any family member who attended the guilt/innocence phase would be excluded at the sentencing phase of the trial. Ultimately, Defendant elected to have his parents remain in the courtroom during the trial, thus forfeiting their testimony at sentencing. He elected to forfeit the presence of his brother and oldest daughter at trial so that they could testify during sentencing. The question before us is whether the trial court erred in its pre-trial rulings, and we proceed with our analysis as if the defense had called Defendant's parents to the stand during the penalty phase and as if the trial court refused to permit them to testify as a sanction for violating the rule by remaining in the courtroom during the guilt/innocence phase.

Tennessee Rule of Evidence 615 does not set forth any particular sanctions that should be imposed for its violation. Accordingly, trial courts have significant discretion when deciding how best to deal with its violation. See, e.g., State v. Upchurch, 620 S.W.2d 540, 543 (Tenn. Crim. App. 1981) ("[W]hether to allow or not allow the testimony of a witness who has violated the rule is within the discretion of the trial court."); Jones v. State, 548 S.W.2d 329, 332 (Tenn. Crim. App. 1976) (recognizing that "it remains a matter of the Trial Judge's discretion as to whether the witness who violated the rule will be permitted to testify"). This discretion should be exercised in light of both the policies at issue as well as the particular facts and circumstances of the case.

The possible sanctions available to a trial judge are numerous. The most severe sanctions include a declaration of mistrial or "a ruling for or against a party on a particular issue." Neil P. Cohen et al., Tennessee Law of Evidence, § 615[11][b] (5th ed. 2005). Either of these sanctions "should be used only in egregious cases," however, "perhaps involving intentional violations of the rule for the purpose of creating perjured testimony." Id. A third potential significant sanction is to hold in contempt the witness who deliberately violates the rule, because imposition of the rule results from a court order. Id.

At the other end of the spectrum, less severe remedies include allowing the offender to testify but subjecting her to cross-examination about her violation, the testimony she heard, and the impact it may have had on her testimony. State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Additionally, the jury may "be instructed to consider the violation of the sequestration order in assessing [the credibility of] the witnesses' testimony." Id.

Of course, another frequently-used sanction, and the one utilized in effect by the trial court in this case, is exclusion of the witness. Generally, this remedy is well within the court's discretion. In the unique arena of criminal prosecutions, however, this particular sanction risks conflict with a defendant's fundamental constitutional right to call witnesses and present a defense. See, e.g., Wright v. State, 473 So.2d 1277, 1280 (Fla. 1985) (recognizing that exclusion of a criminal defendant's witness for violating the rule "implicates the defendant's sixth amendment right to present witnesses in his own behalf"); Commonwealth v. Scott, 436 A.2d 161, 163 (Pa. 1981) (recognizing that excluding a criminal defense witness for offending the rule could "constitute a violation of his fundamental constitutional rights to compulsory process for obtaining witnesses in his favor and to a fair trial"); Webb, 766 S.W.2d at 240. This remedy is therefore disfavored in this category of cases. See, e.g., United States v. Torbert, 496 F.2d 154, 158 (9th Cir. 1974) ("[B]ecause of the availability of alternative sanctions to enforce the order [of sequestration], and because of the constitutionally based right of the defendant to relevant testimony in his favor, it is ordinarily an abuse of discretion to disqualify a witness unless the defendant or his counsel have somehow cooperated in the violation of the order." (citations omitted)); United States v. Schaefer, 299 F.2d 625, 631 (7th Cir. 1962) ("Sequestration of witnesses is a great aid in eliciting the truth, but disqualification of the offending witness absent particular circumstances is too harsh a penalty on the innocent litigant"); Robinson v. Tennessee, 340 F.Supp. 82, 86 (E.D. Tenn. 1972), aff'd 474 F.2d 1273 (6th Cir. 1973) ("A court . . . should have no discretion to exclude the testimony of a witness violating an exclusion rule where the testimony of the witness was material to the case and where such violation was without fault on the part of a party or his counsel."); Benn v. United States, 801 A.2d 132, 141 (D.C. 2002) (recognizing that "a witness who has violated a sequestration order may be excluded from the witness stand only under extreme and exceptional circumstances"); State v. Burdge, 664 P.2d 1076, 1084 (Ore. 1983) (holding that "exclusion of a witness in a criminal case is too grave a sanction where the violation of the [sequestration] order was not intentional and not procured by a connivance of counsel or for some improper motive."); Scott, 436 A.2d at 163 ("Because of the availability of alternative sanctions to enforce a sequestration order and because of the fundamental constitutional basis for an accused's right to present relevant testimony in his favor, it ordinarily would be an abuse of discretion to disqualify a witness unless either the accused or his counsel has somehow cooperated in the violation of the order."); State v. Burke, 522 A.2d 725, 729 (R.I. 1987) ("Unless violation

of the sequestration order is due to the consent, connivance, procurement or knowledge of the defendant or his counsel, a trial justice should not deprive a criminal defendant of his right to present testimony [but should instead] consider alternative sanctions . . . such as the issuance of a cautionary instruction to the jury or in some instances a contempt proceeding against the witness."  (citations omitted)); Williams, 523 S.W.2d at 380 ("The power to exclude the testimony of a witness who has violated the rule should be rarely exercised.);  In re KC v. State, 92 P.3d 805, 808 (Wyo. 2004) ("Exclusion should be allowed only when it is necessary to preserve the integrity of the fact finding process."). Indeed, the Supreme Court has recognized that

> [i]f a witness disobeys the order of withdrawal, while he may be proceeded against for contempt and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground merely, although the right to exclude under particular circumstances may be supported as within the sound discretion of the trial court.

Holder v. United States, 150 U.S. 91, 92 (1893); see also Smith v. State, 72 Tenn. 428, 430 (1880) (recognizing that "the right of excluding the witness for disobedience to the [sequestration] order is in the discretion of the Court, a discretion rarely exercised" and that "if the witness remain in Court, in disobedience of the order of separation, his testimony, on that ground alone, cannot be excluded, but is a matter for observation on his evidence").

Several courts have pondered the "particular circumstances" referred to in Holder that may support exclusion.  In Schaefer, the federal Court of Appeals for the Seventh Circuit interpreted Holder as meaning that a trial court "may not disqualify the witness merely because he disobeys the rule but that this alternative is available if particular circumstances are shown. . . . [W]e interpret these particular circumstances to mean some indication the witness was in court with 'the consent, connivance, procurement or knowledge of the appellant or his counsel.'" 299 F.2d at 631 (quoting Holstein v. Grier, 262 S.W.2d 954, 955 (Tex. Ct. Civ. App. 1953)).  In Braswell v. Wainright, 463 F.2d 1148 (5th Cir. 1972), the United States Court of Appeals for the Fifth Circuit considered a habeas corpus proceeding by a defendant who had been convicted of aggravated assault in a Florida state court.  During the trial, the defense called a witness who had been present in the courtroom, despite invocation of the rule.  The trial court sustained the prosecution's objection on the basis of the rule.  The federal appellate court held that the trial court thereby erred because it "arbitrarily excluded [the witness] upon no other basis than that he violated the rule."  Id. at 1156.  The court emphasized that, when facing a challenge to a defense witness under the rule, a trial court must take into account the "particular circumstances" of the case and "weigh the exclusion of the witness against the

defendant's [federal constitutional] right to obtain witnesses in his behalf." Id. at 1155. Where the witness is vital to the defense, the trial court may order exclusion only on the basis of "some overriding policy consideration" or where the defendant makes a valid waiver of his sixth amendment right to call witnesses on his behalf. Id. at 1156.

Similarly, in Webb, the Texas Court of Criminal Appeals considered the direct appeal of a defendant convicted of aggravated robbery and sentenced to fifty-five years. The defense called Elaine Adams to the stand in an effort to rebut a prosecution witness. The prosecution objected on the basis that she had been in the courtroom in violation of the rule. The trial court sustained the objection "[s]olely on the basis that the 'rule' had been invoked and violated." Webb, 766 S.W.2d at 239. After observing that "[t]he question of what 'particular circumstances' may serve to support exclusion of a witness is broad only in the abstract factual context of a case," id. at 241, the court determined that a trial court faced with this issue must first consider the reason for the violation and the significance of the witness's testimony to the defendant's case, id. at 242. The court formulated the following test for balancing the policies served by the rule against a defendant's constitutional right to call witnesses:

> Where the "particular and extraordinary circumstances" show neither the defendant nor his counsel have consented, procured, connived or have knowledge of a witness or potential witness who is in violation of the sequestration rule, and the testimony of the witness is crucial to the defense, it is an abuse of discretion exercised by the trial court to disqualify the witness.

> Application of the standard must necessarily be on a case-by-case basis, weighing or balancing the interests of both the State and the accused in a fair proceeding. Thus, in the exercise of sound judicial discretion a court must consider alternatives available to it and then choose among them. Other sanctions, such as a cautionary instruction or a contempt proceeding, are less pervasive options when an order has been violated. The trial court must consider both the benefit and detriment flowing from the order of disqualification. A detriment of disqualification will always be the loss to the accused of the proffered testimony; evaluating this loss will require considering the relative strength of the testimony, the importance or "crucial" nature of the issue upon which it is offered, and the extent to which it is cumulative of other evidence in the case. In contrast, the benefits of disqualification include avoiding the risk that the party proffering the testimony either intentionally or negligently violated the rule through the actions of accused, counsel or witness; or that the witness's testimony will be tainted by exposure to other testimony or discussion.

This is not to say that the test is exclusive; other "particular or extraordinary circumstances" may well exist, given the facts of each case. However, the rationale for the test remains constant: given the constitutional rights of an accused, disqualification of an offending witness absent particular and articulable circumstances is too harsh a penalty to impose upon a defendant who is without a verdict and chooses to exercise his right to call witnesses in his behalf.

Id. at 244 (citation omitted). See also, e.g., Burdge, 664 P.2d at 1085 ("Refusal to allow defense witnesses to testify for violation of an . . . order [of sequestration] should be imposed only when necessary to preserve the 'integrity of the fact-finding process' and requires that the competing interests be closely examined." (quoting Berger v. California, 393 U.S. 314, 315 (1969))); Commonwealth v. Smith, 346 A.2d 757, 760 (Pa. 1975) ("The selection of a remedy for the violation of a sequestration order is within the sound discretion of the trial court. In exercising its discretion, the trial court should consider the seriousness of the violation, its impact on the testimony of the witness, and its probable impact on the outcome of the trial." (citations omitted)).

We recognize that this case does not involve any question regarding the circumstances under which Defendant's parents were in "violation" of the rule. Rather, it appears that they made a decision to respect the trial court's pretrial rulings and attended their son's trial with the knowledge that they would therefore not be allowed to testify during the sentencing hearing. There is, accordingly, no issue of bad faith, collusion, etc., here.[10] These cases are instructive, nonetheless, as indicative of the factors a trial court should consider before excluding a defense witness in a criminal trial for violating the rule. Automatic exclusion of an accused's witness who has been present during testimony in violation of the rule, with no consideration given to the impact of the proffered testimony or other relevant circumstances, risks error.

*D. Admissibility of Evidence in Capital Sentencing Trials*

Because this is a capital case, Tennessee Rule of Evidence 615 is not the only provision we must consider in reviewing the trial court's rulings on Defendant's pretrial motions concerning witness sequestration. Tennessee Code Annotated section 39-13-204(c) governs the admission of evidence in capital sentencing trials and provides as follows:

---

[10] To the extent a party's lawyer encourages a witness to violate the rule, a trial court would be justified in suspecting that the violation was committed for the express purpose of altering the witness's testimony. That, of course, is the precise outcome intended to be avoided by imposition of the rule, and such behavior justifies a severe sanction.

In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received *regardless of its admissibility under the rules of evidence;* provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection (c) shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee. . . . The court shall permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons. Such evidence may be considered by the jury in determining which sentence to impose. The court shall permit members or representatives of the victim's family to attend the trial, and those persons shall not be excluded because the person or persons shall testify during the sentencing proceeding as to the impact of the offense.

Tenn. Code Ann. § 39-13-204(c) (2003) (emphasis added). This Court has emphasized that this statute "'expressly exempts evidence adduced in capital sentencing proceedings from the usual evidentiary rules.'" State v. Sims, 45 S.W.3d 1, 13 (Tenn. 2001) (quoting State v. Odom, 928 S.W.2d 18, 28 (Tenn. 1996)). And, we have previously concluded that

in general, [section] 39-13-204(c) should be interpreted to allow trial judges wider discretion than would normally be allowed under the Tennessee Rules of Evidence in ruling on the admissibility of evidence at a capital sentencing hearing. *The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment*, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. *Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family*. The rules of evidence

40

can in some instances be helpful guides in reaching these determinations of admissibility. *Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.*

Id. at 14 (emphases added); see also State v. Reid, 213 S.W.3d 792, 817 (Tenn. 2006) ("The rules of evidence . . . do not limit the admissibility of evidence in a capital sentencing proceeding."); State v. Austin, 87 S.W.3d 447, 459 (Tenn. 2002) ("The Rules of Evidence should not be applied to preclude the admission of relevant evidence in a capital sentencing hearing."). Thus, we have held that, in a capital sentencing hearing, the question is not whether a particular item of proof is admissible pursuant to the Tennessee Rules of Evidence, "but instead whether that evidence was reliable and relevant to one of the aggravating or mitigating circumstances." Reid, 213 S.W.3d at 817. These cases make clear that, in a capital sentencing proceeding, trial courts must carefully evaluate any and all proffered mitigation evidence, utilizing any applicable Rules of Evidence only as guidelines rather than as mandatory strictures. A rigid adherence to Rule 615, or any other particular Rule of Evidence, is contraindicated by section 39-13-204(c).

*E. Intersection of the Rule and Capital Sentencing*

Only rarely have courts specifically addressed the intersection of the rule and a capital defendant's right to present mitigation proof. In Dutton v. Brown, 812 F.2d 593 (10th Cir. 1987) (en banc), the United States Court of Appeals for the Tenth Circuit considered a habeas corpus action by a defendant who had been convicted in Oklahoma of first degree murder and sentenced to death. The same jury considered both the defendant's guilt and sentence in separate proceedings. Sequestration was ordered at the beginning of trial. During the sentencing phase, the defense called the defendant's mother. The trial court "*sua sponte*, prohibited [her] from testifying because she had attended the trial." Id. at 595. The defendant's attempts to obtain relief through direct appeal and post-conviction proceedings were unsuccessful.

In granting habeas corpus relief on the defendant's sentence, the Court of Appeals stressed that the defendant's mother's testimony "would have been relevant mitigating evidence and its exclusion impeded the jury's ability to consider relevant aspects of [the defendant's] character." Id. at 601. The mitigating evidence about which she would have testified included "family background, medical history and education." Id. The defendant's trial counsel indicated that the defendant's mother "would have told the jury that her son was 'immature,' was a 'slow learner,' did not 'think real well,' was 'not very smart,' and was a 'follower.'" Id.

In conducting its analysis, the appellate court stressed the unique nature of the death penalty and the constitutional requirement "that the sentencer 'not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" Id. at 600 (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978)). The court also recognized the Supreme Court's holding that a trial court's exclusion of relevant mitigating evidence may "'impede[] the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.'" Id. at 601 (quoting Skipper v. South Carolina, 476 U.S. 1, 8 (1986)). And, while the court recognized that "Oklahoma's rule of sequestration is a valid and important state rule," id., it held that "the state trial judge erred by refusing to permit counsel the opportunity to present this evidence to the sentencing jury," id. at 599. The Court emphasized that "evidentiary rules 'may not be applied mechanistically'" during the penalty phase of a capital case, id. at 601 (quoting Green v. Georgia, 442 U.S. 95, 97 (1979) (per curiam)), and offered the following guidance:

> Assuming the exclusion order properly applied to the sentencing proceeding, the trial court had the discretion to select means other than the exclusion of [the defendant's mother's] testimony to enforce the sequestration order. For example, it could have allowed [her] to testify, and then instructed the jury that she was present during the guilt proceeding. That approach would have permitted the jury to assess the witness's credibility while, at the same time, allowed [the defendant] to present crucial mitigating evidence.

Id.

In a separate concurring opinion, Judge Moore emphasized the trial court's discretion under Oklahoma law to admit or exclude the testimony of a witness who did not abide by an order of sequestration, and chastised the trial court because it "made no effort to exercise this discretion, despite the knowledge that [the defendant's mother] was a vital witness." Id. at 603 (Moore, J., concurring). Judge Moore further observed that, "[e]ven through the Oklahoma rule is valid and important, its application to this case worked a result which was beyond the underlying purpose of the rule itself" and "was mechanistic and constitutionally unsupportable." Id. at 604.

In rendering its decision, the Dutton court relied on Wright v. State, 473 So.2d 1277 (Fla. 1985). Id. at 602. In Wright, the Florida Supreme Court considered a case in which the defendant denied his involvement in the victim's murder. He was nonetheless convicted and sentenced to death. After the close of the proof in the guilt phase of the trial, the defense sought to introduce "newly discovered testimony" by a witness "who

had listened to portions of the trial testimony, followed newspaper accounts of the trial, and discussed testimony with various persons attending the trial." Id. at 1279. Her testimony would have corroborated the defendant's. The trial judge refused to reopen proof on the basis that her testimony would violate the rule of sequestration.

The Florida Supreme Court held that "the trial judge erred in failing to exercise his discretion to determine whether exclusion was warranted under the circumstances, and, instead, applied the sequestration rule as a strict rule of law." Id. at 1280. The Court emphasized that the rule of sequestration "must not be enforced in such a manner that it produces injustice" and that "enforcement of the rule against a defendant seeking to introduce the testimony of a witness who has heard testimony in violation of the rule implicates the defendant's sixth amendment right to present witnesses in his own behalf." Id. The Court offered the following guidance:

> Before it excludes testimony on the ground that the sequestration rule was violated, the trial court must determine that the witness's testimony was affected by other witnesses' testimony to the extent that it substantially differed from what it would have been had the witness not heard the testimony. Because of the sixth amendment ramifications, the court must carefully apply this test before it excludes any material testimony offered by a defendant in a criminal case, and should also consider whether the violation of the rule of sequestration was intentional or inadvertent and whether it involved bad faith on the part of the witness, a party, or counsel.

Id.; see also Cobb v. State, 260 S.E.2d 60, 70-71 (Ga. 1979) (holding that trial court abused its discretion in disqualifying capital defendant's wife from testifying in presentence hearing because she was present at trial, where no evidence that her violation of the rule was willful and where testimony she heard was not material to punishment).

These cases, as well as those we have referred to in the preceding section on Rule 615, make clear that a trial court should not automatically or arbitrarily exclude a defense witness from a capital sentencing trial simply on the basis that the rule was invoked at the beginning of trial and the witness nevertheless remained in the courtroom. Rather, the court should exercise its discretion and consider all relevant circumstances. Those circumstances may include, but are not limited to: (1) the reasons for the proffered witness's presence during the trial in contravention of the sequestration order; (2) any complicity of the defendant and/or his counsel in the violation of a sequestration order; (3) the relevance of the proffered witness's testimony; (4) the relationship, if any, between the proffered witness's proposed testimony and the testimony he or she heard in violation of the rule; (5) the potential impact on the proffered witness's testimony by proof heard in violation of the rule; (6) the extent to which the proffered testimony is

cumulative; (7) the efficacy of less drastic remedies; (8) the policies favoring admission of the witness's testimony; and (9) the extent to which allowing the witness to testify will contravene the purposes served by the rule. To reiterate, the trial court must "inquir[e] into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family." Sims, 45 S.W.3d at 14. In conducting this evaluation, the trial court should place on the record its analysis and the reasons for its ruling. In no event should a trial court automatically or mechanically rely on Tennessee Rule of Evidence 615 to exclude mitigation proof from a capital sentencing trial on the basis that the witness was present during the guilt/innocence phase of the trial. See Reid, 213 S.W.3d at 817 (in determining whether to admit or exclude evidence at a capital sentencing hearing, the test is whether the evidence is "reliable and relevant to one of the aggravating or mitigating circumstances").

In this case, the trial court twice applied Rule 615 in a strict manner and, in so doing, prevented Defendant from offering his parents' mitigation testimony at sentencing. We hold that, in denying Defendant's motions seeking relief from the rigid application of Rule 615 to the sentencing proceeding, the trial court applied an incorrect legal standard and thereby committed error.[11] See Benn, 801 A.2d at 141 (trial court abused its discretion because it "did not engage in the analysis that is legally required before the 'draconian' sanction of exclusion may properly be imposed"). As set forth above, Tennessee Code Annotated section 39-13-204(c) provides that a trial court may admit *any* proof it "deems to have probative value on the issue of punishment . . . regardless of its admissibility under the rules of evidence." Accordingly, before excluding Defendant's parents' mitigation testimony on the basis of Rule 615, the trial court should first have evaluated its probative value. The trial court did not engage in this analysis, and thereby erred. Moreover, to the extent the trial court may have engaged in the appropriate analysis, we hold that it reached the wrong result. Clearly, Defendant's parents wanted to attend their son's trial out of parental concern rather than in an effort to tailor their testimony; there was no collusion with counsel or Defendant in a clandestine attempt to

---

[11] In addition to arguing that the trial court abused its discretion in its strict application of Rule 615, the defense also argues that the capital sentencing statute violates equal protection and the separation of powers doctrines because it specifically exempts persons related to the victim from the rule, but not those persons related to the defendant. Because we have determined that the trial court abused its discretion with respect to its Rule 615 rulings, it is not necessary that we address these alternative allegations of constitutional error. See Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995) ("If issues in a case can be resolved on non-constitutional grounds, courts should avoid deciding constitutional issues."). Moreover, this Court has previously rejected the argument that -304(c) violates separation of powers principles because it specifically permits members of the victims' families to both attend the guilt phase of a capital trial and subsequently testify during the sentencing proceeding. See State v. Odom, 137 S.W.3d 572, 602-04 (Tenn. 2004) (appendix).

circumvent the rule; their testimony was relevant to mitigation; there was little risk that anything Defendant's parents heard during the trial would have altered their testimony; the trial court could have instead instructed the jury to take into consideration that Defendant's parents were present during trial when assessing their credibility; and allowing them to testify would not have contravened the underlying purpose of the rule.

## *F. Exclusion of Testimony was Error*

Our capital sentencing scheme permits a jury to impose the death penalty only upon adequate proof of certain enumerated aggravating factors. Mitigation proof is not so limited, however. Rather, the jury is required to consider *any* mitigating circumstances that are raised by the proof at either the guilt or sentencing hearing. Tenn. Code Ann. § 39-13-204(j), (j)(9) (2003). Specific examples of mitigating circumstances are set forth in the statute:

(1) The defendant has no significant history of prior criminal activity;

(2) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

(3) The victim was a participant in the defendant's conduct or consented to the act;

(4) The murder was committed under circumstances that the defendant reasonably believed to provide a moral justification for the defendant's conduct;

(5) The defendant was an accomplice in the murder committed by another person and the defendant's participation was relatively minor;

(6) The defendant acted under extreme duress or under the substantial domination of another person;

(7) The youth or advanced age of the defendant at the time of the crime;

(8) The capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication, which was insufficient to establish a defense to the crime but which substantially affected the defendant's judgment[.]

45

Tenn. Code Ann. § 39-13-204(j). Further, the United States Supreme Court has declared that the federal constitution requires the jury in a capital case be allowed to consider mitigating evidence, including "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604; see also Tenn. Code Ann. § 39-13-204(j)(9) (mandating that the jury consider as mitigating circumstances "[a]ny other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing"). And, this Court has recognized "that article I, §§ 8 and 16 of the Tennessee Constitution require that the jury not be prevented from hearing evidence about the defendant's background, record, and character, and any circumstances about the offense that may mitigate against the death penalty." State v. Stout, 46 S.W.3d 689, 704 (Tenn. 2001). This Court has previously recognized the probative value of a capital defendant's family members' testimony about their relationship with the defendant. See, e.g., State v. Thacker, 164 S.W.3d 208, 224 (Tenn. 2005) ("Testimony concerning the defendant's estranged relationship with his parents was relevant as mitigating evidence."); State v. Cauthern, 967 S.W.2d 726, 738-39 (Tenn. 1998) (holding that trial court erred in excluding letter to defendant from young son expressing love and support).

Defendant's parents should have been allowed to testify at the sentencing hearing in spite of their attendance at Defendant's trial, and we hold that the trial court erred in excluding this mitigation testimony. We must, therefore, determine the result of this error. "[T]he exclusion of mitigating evidence potentially undermines the reliability of the sentencing determination, and is an error of constitutional magnitude. Thus, the burden is on the State to prove that the error did not affect the verdict and, therefore, was harmless beyond a reasonable doubt." Id. at 739 (citing Skipper, 476 U.S. at 4; Satterwhite v. Texas, 486 U.S. 249, 258 (1988); Chapman v. California, 386 U.S. 18, 24 (1967)).

*G. Constitutional Harmless Error*

This Court has previously considered cases in which the trial court erroneously excluded mitigation evidence and found the error to be harmless beyond a reasonable doubt where the substance of the excluded evidence was nevertheless before the jury. For instance, in Thacker, the defense sought to introduce evidence about the defendant's strained relationship with his parents. The trial court prevented the defense from asking one witness about statements the defendant had made to her about his upbringing. However, another witness was permitted to testify that the defendant's parents were absent from the trial by their own choice. This same witness also explained that the defendant had had little contact with his mother as a child, and that his father had sent him to live with his grandparents after remarrying. This Court ruled that the testimony

46

from the one witness was sufficient to render harmless beyond a reasonable doubt the trial court's erroneous exclusion of the other witness's testimony. Thacker, 164 S.W.3d at 225.

Similarly, we ruled in Cauthern that the trial court's erroneous exclusion of the defendant's son's letter was harmless beyond a reasonable doubt because the defendant testified that his young son visited him every few months, a photograph of the defendant's son was admitted, and the trial court "instructed the jury that it could consider the fact that the defendant has a minor son as a non-statutory mitigating factor." 967 S.W.2d at 739. See also State v. Rimmer, 250 S.W.3d 12, 24-25 (Tenn. 2008) (although trial court erroneously excluded mitigation testimony on basis of hearsay, error was harmless beyond a reasonable doubt because essence of excluded testimony was otherwise presented to jury); Austin, 87 S.W.3d at 459 (trial court erroneously refused to admit hearsay evidence, but harmless beyond a reasonable doubt because essence of hearsay was admitted through other testimony); cf. Stout, 46 S.W.3d at 704-05 (trial court erred in ruling proposed mitigation proof inadmissible, but harmless beyond a reasonable doubt because of low probative value and jury rejected similar evidence during guilt phase).

As set forth above, the defense anticipated that Defendant's parents would have testified "that they love their son . . . and basically just other things about the family relationship." Although we are sensitive to the significance which a jury may attach to the failure of a defendant's parents to testify in mitigation, our close and careful review of the record in this case convinces us beyond a reasonable doubt that the absence of Defendant's parents' testimony at sentencing was harmless.

During the guilt/innocence phase of the trial, Dr. Wilson testified about Defendant's relationship with his parents:

> [Defendant] had a stable family life, a loving father, loving mother. They were both active in the community, good parents, no abuse. . . . Environment was very stable. It was actually a two-parent family, which is kind of unusual these days. They were married for a long period of time. They raised their children correctly. . . . The family was involved in the community, as I said. Father was a Little League coach. Mother worked in a daycare. They were both above reproach. There's no alcoholism, no mental illness in the family, no kind of abuse.
>
> From this I hypothesized that the Defendant was raised in a stable, nurturing environment . . . [and] he went on with the rest of his life in an attempt to recreate what he had had as a child . . . .

Dr. Wilson testified again at the sentencing hearing and reiterated that Defendant "has the support and love of his family and friends." Dr. Wilson stated that he had interviewed Defendant's parents and that both of them were in the courtroom. He also opined that it "absolutely would be devastating to them" if Defendant received the death penalty.

Additionally, Defendant's younger brother Larry Jordan testified. He explained that their father was in the courtroom and was in poor health, suffering from cancer and diabetes, and that he had suffered a stroke approximately a year earlier. Mr. Jordan also pointed out where their mother was sitting next to their father, and identified numerous family photographs in which Defendant was shown at various stages of his life with his brothers and/or parents.

Gary Morris, the pastor of Bemis United Methodist Church, also testified that he knew Defendant's parents as congregants of his church, and noted their presence in the courtroom. Mr. Morris explained that Defendant's parents brought Defendant's children to church with them. Mr. Morris echoed that a death sentence would be "devastating" to Defendant's family.

Considered in its entirety, this proof provided the jury with a portrait of Defendant's parents as loving and supportive, and who would be devastated by their son being sentenced to death. Thus, the jury was presented with the "essence" of the excluded testimony. And, while the jury should have been given the opportunity to hear this proof directly from Defendant's parents, we are convinced beyond a reasonable doubt that the jury's verdicts of death would have been the same even had this testimony been allowed. The jury applied multiple aggravating circumstances as to each victim. While the defense elicited a considerable amount of evidence in support of mitigating circumstances, the State both challenged much of this proof and also adduced overwhelming evidence in support of aggravating factors. Accordingly, we hold that Defendant is not entitled to relief on the basis that his parents did not testify in mitigation at the sentencing trial.

## II. Denial of Public Trial

In a related issue, the defense contends that the trial court's strict application of Rule 615, such that his family members had to choose between attending his trial or testifying in mitigation in the event Defendant was convicted, compromised his right to a public trial because two family members were not able to attend the guilt/innocence phase in order to preserve their rights to testify during the penalty phase. See Cohen, supra, at § 615[10] ("Since the accused in Tennessee is entitled to a 'speedy and public trial,' the prosecution's use of Rule 615 to exclude a member of the public theoretically conflicts

48

with the accused's right to a public trial.") (footnote omitted).  On the facts of this case, we disagree.

The right to a public trial is guaranteed by both our federal and state constitutions. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  The right is not absolute, however. See Waller v. Georgia, 467 U.S. 39, 45 (1984).  As recognized by the Rhode Island Supreme Court,

> although rooted in the reaction to the abuses of the secret proceedings of the English Star Chamber, [the right to a public trial] is not usually viewed as imposing "a rigid, inflexible straitjacket" upon a trial justice's conduct of a trial.  Rather has it generally been recognized as being subject to a court's inherent power to regulate admission to the courtroom and to restrict attendance at the trial as conditions and circumstances may reasonably demand in order to preserve order and decorum, or to protect the rights of the parties and the witnesses, or generally to further the administration of justice.

State v. Mancini, 274 A.2d 742, 747 (R.I. 1971).  See also State v. Lawrence, 167 N.W.2d 912, 914 (Iowa 1969) (observing that the right to a public trial "has generally been viewed as a right subject to the inherent power of the court to limit attendance as the conditions and circumstances reasonably require for the preservation of order and decorum in the courtroom, and to reasonably protect the rights of parties and witnesses").

Our own Court of Criminal Appeals has recognized that the right to a public trial

> serves as a guarantee that the accused will be "fairly dealt with and not unjustly condemned."
>
> The presence of citizens in the courtroom safeguards the accused against (a) the court being used as an instrument of persecution, (b) the abuse of judicial power and discretion, and (c) potentially perjurious and abusive testimony.  In addition, the public's presence may induce unknown witnesses to come forward with evidence relevant to the issues in controversy or facts which can be used to impeach a witness, encourage the trial participants to perform their respective duties conscientiously, and afford the citizens in the community an opportunity to observe the criminal justice system in progress, determine whether the system is functioning adequately, and express these findings in the form of public opinion.

<u>State v. Sams</u>, 802 S.W.2d 635, 638 (Tenn. Crim. App. 1990) (quoting <u>Estes v. Texas</u>, 381 U.S. 532, 538-39 (1965)) (footnotes omitted). The sequestration of individual witnesses pursuant to the rule does not threaten any of these interests. Indeed, witnesses sequestered pursuant to the rule "are no longer considered members of the general public for purposes of exclusion from the courtroom during criminal proceedings." <u>Tharp v. State</u>, 763 A.2d 151, 160 (Md. 2000). Thus, "it is clear that sequestration of witnesses in the ordinary case does not violate a right to a public trial." Cohen, <u>supra</u>, at § 6.15[10]. <u>See also</u> <u>State v. Worthen</u>, 100 N.W. 330, 331 (Iowa 1904) (holding that sequestration of criminal defendant's witnesses did not infringe upon his constitutional right to a public trial).

In this case, the trial court excluded from Defendant's trial only those persons who would be witnesses. Although we have held that the trial court erred in its rigid application of Rule 615 to Defendant's sentencing hearing, the trial court's error did not violate Defendant's right to a public trial. Defendant has cited us to no case law standing for the proposition that a trial court who errs in applying a sequestration order thereby necessarily violates a defendant's right to a public trial, and we have found none. Defendant is not entitled to relief on this basis.

## III. Denial of Requested Limiting Instruction Regarding Dr. Matthews's Opinion Testimony

During his testimony in rebuttal during the guilt/innocence phase of Defendant's trial, the State's witness Dr. Daryl Matthews stated that, in forming his expert opinion about Defendant's mental status, he "relied a great deal on the statements of the various people who were at the scene." One of the statements he referred to was a transcript of the call that TDOT mechanic and reserve sheriff's deputy Freddie Ellison placed to the sheriff's department, in which Ellison told the dispatcher that he knew Defendant and that Defendant had told him "to go on" and "back off." From this, Dr. Matthews inferred that Defendant "had a lot of capacity to choose who he was going to shoot and who he wasn't going to shoot." In additional support of this conclusion, Dr. Matthews referred to Officer Anderson's report that quoted Defendant as stating that he did not want to shoot the police; to Mr. Bond's statement that Defendant "looked up and saw me and shook his head as if to tell me he didn't want me involved"; and to Mr. Leach's statement that, when Defendant drove up to the garage and got out of his truck, Defendant walked past Leach and nodded at him.

Dr. Matthews also quoted from Paul Forsythe's statement about Defendant's interaction with Mr. Gordon. Forsythe had described the "driver of the red truck" as "fold[ing] the seat forward on the truck" and then "pull[ing] out a black rifle with a silencer or something on the end of the barrel." Defense counsel objected and requested

the trial court to instruct the jury that there was no proof in the record that the gun with which Defendant shot Mr. Gordon was equipped with a silencer. The trial court refused on the basis that Forsythe's statement did not claim definitively that the gun had a silencer, but merely reflected that he thought he saw something that looked like one. The court also told defense counsel that "the jury will be told they've got to look to the basis . . . of the expert's opinion, how he formed his opinion, what he relied on."

Later, Dr. Matthews quoted from a statement by Jerry Reynolds, reciting that, when Reynolds told James Ricky Simpson that Defendant had "just killed Renee," Simpson responded, "That son of a bitch called up there this morning . . . ." Defense counsel objected to this testimony on the basis that it was hearsay. The court told the prosecution to "move along" and instructed the jury to disregard "the last statements made."

Dr. Matthews also quoted from Defendant's statement as reported by Investigator Miller. Investigator Miller reported that Defendant "continued to make statements to me and ask questions such as: 'How much time do you think I'll get for this? I don't want to rot in prison. I should have killed myself when the police stopped me. I hope I get the death penalty."

After Dr. Matthews' testimony was concluded, defense counsel addressed the trial court about the proposed jury instructions and requested that the jury be instructed not to consider the hearsay contained in Dr. Matthews's expert testimony as substantive evidence. The court responded that it intended to charge Tennessee Pattern Jury Instruction 42.02, emphasizing that portion of the instruction which informs the jury that it is to evaluate expert testimony based upon its "judgment about whether the witness's background or training and experience is sufficient for the witness to give the expert opinion" and that it had to "also decide whether the witness's opinions were based on sound reasons, judgment and information." Defense counsel stated that this instruction was not adequate and reiterated that the jury should also be instructed that "the hearsay is not substantive evidence and it should not be used as proof of the underlying facts that the expert is basing his opinion on." The trial court did not issue the requested limiting instruction.

In its brief to this Court, the State concedes that the trial court erred in not giving the requested instruction, but contends that the error is harmless. We address this issue both with respect to any impact on the guilt/innocence phase of Defendant's trial, and also with respect to any impact on the sentencing phase of Defendant's trial.

Tennessee Rule of Evidence 703 sets forth the evidentiary parameters for the grounds on which expert witnesses base their opinions. The Advisory Commission

51

Comments to Tennessee Rule of Evidence 703 provide that "[i]f the bases of expert testimony are not independently admissible, the trial judge should either prohibit the jury from hearing the foundation testimony or should deliver a cautionary instruction." Where an expert witness is referring to hearsay statements not otherwise admissible, then, the trial court should instruct the jury that the hearsay statements are to be used only for evaluating the expert witness's testimony and should not be relied on as substantive evidence. The trial court erred by not issuing the requested limiting instruction.

However, the trial court's error entitles Defendant to a reversal of his convictions only if the failure to give the limiting instruction "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). The "crucial consideration" in this inquiry "is what impact the error may reasonably be taken to have had on the jury's decision-making." State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008). With one possible exception, we have no trouble concluding that there was no impact on the jury's deliberations resulting from the trial court's failure to instruct the jury that it could not consider as substantive evidence the otherwise inadmissible hearsay included in Dr. Matthews's testimony because the hearsay added very little to what was already before the jury from other testimony.[12]

We are troubled, however, by Dr. Matthews's rebuttal testimony about Defendant's statements to Investigator Miller, including "I don't want to rot in prison. I should have killed myself when the police stopped me. I hope I get the death penalty." Dr. Matthews characterized Defendant's statements as

> concern about the future, wondering about his – his penalty, knowing that what he did was a crime, knowing something was going to happen, knowing what the possible penalties are, knowing he could get the death

---

[12] We note that some of the hearsay to which Dr. Matthews referred was, in fact, admissible pursuant to an exception to the general rule disallowing hearsay. For instance, Ellison's phone call to the sheriff's department was admissible as an "excited utterance," see Tenn. R. Evid. 803(2), and was, indeed, admitted during the State's case-in-chief without objection. Defendant's statements were admissible as admissions. See Tenn. R. Evid. 803(1.2). A limiting instruction is not necessary where the hearsay to which the expert is referring is otherwise admissible. See Tenn. R. Evid. 703 advisory comm'n cmts.

However, Dr. Matthews's reference to Forsythe's statement, obtained during an interview, involved inadmissible hearsay. The defense's complaint about this testimony is limited to the mention of a silencer. However, since witnesses testified that they heard gunshots, it is highly unlikely that the statement had any effect on the jury. Similarly, the report about Simpson's statement appears to have been inadmissible hearsay. The trial court instructed the jury to disregard the statement, however, and the jury is presumed to have followed the trial court's instruction. State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006). Additionally, the proof already showed that Defendant had acknowledged other persons at the TDOT facility and had called Mrs. Jordan earlier.

penalty, choosing, is it better to rot in jail or get the death penalty. At that moment, he was reflecting about that and decided on the death penalty.

This testimony was offered to rebut the defense's expert testimony that Defendant was incapable of premeditation and intent at the time he shot the victims.

Even relevant and otherwise admissible evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403; see also State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). However, the defense did not make a contemporaneous objection to this testimony or request that the jury be instructed to disregard it. Any error in the admission of this testimony has therefore been waived. State v. Hines, 758 S.W.2d 515, 519 (Tenn. 1988) (defendant not entitled to relief from death sentence on basis that his statement that he wanted death penalty was admitted during guilt phase and no objection was lodged). Nevertheless, we recognize that admitting into evidence a defendant's declarations about desiring the death penalty may create a risk that the jury will subsequently rely on the defendant's statements when deciding punishment. Accordingly, the admission of such statements should occur only after careful weighing, and the trial court should consider providing a limiting instruction to ensure that the jury does not utilize the declarations as a non-statutory aggravating circumstance.

While it may have been preferable for Defendant's declarations to have been excluded or accompanied by a limiting instruction, we are persuaded beyond any doubt that their admission had no impact on the jury's decisions to convict Defendant and subsequently to sentence him to death for each of the murders he committed. The State did not rely on this evidence during any of its closing arguments. Moreover, the proof in this case, both as to Defendant's guilt and as to the valid aggravating circumstances, was simply overwhelming. The trial court instructed the jury correctly about the elements of the crimes and the jury's responsibilities with respect to determining whether to convict Defendant of those crimes. The trial court also informed the jury that it could sentence Defendant to death only upon its finding one or more aggravating circumstance for each victim, and finding that the aggravating circumstance(s) outweighed the mitigating circumstances beyond a reasonable doubt. The jury was in no way informed that it could consider Defendant's statements about his punishment in either determining his guilt or in imposing sentence. Accordingly, we hold that Defendant is not entitled to relief on this basis.

IV. Victim Impact Witnesses

Defendant raises two complaints about the victim impact testimony in this case. First, he asserts that Renee Dawson should not have been allowed to testify about the impact of David Gordon's death because she was his fiancée rather than a family

53

member.  Second, he asserts that an "excessive" number of witnesses testified about the impact of David Gordon's murder. In addition to Ms. Dawson, the victim's older brother and his eldest son testified, for a total of three victim impact witnesses.  The State disagrees that any error was committed in this regard.

Tennessee Code Annotated section 39-13-204(c) provides in pertinent part that the trial court

> shall permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons.  Such evidence may be considered by the jury in determining which sentence to impose.

Tenn. Code Ann. § 39-13-204(c).  The statute does not place any restriction on the number of witnesses who may testify about the murder's impact.  This Court has recognized, however, that the admissibility of victim impact evidence is subject to limits. State v. Nesbit, 978 S.W.2d 872, 891 (Tenn. 1998).  Thus, victim impact evidence should be excluded if it "threatens to render the trial fundamentally unfair or [if it] poses a danger of unfair prejudice."  Id. (citing Payne v. Tennessee, 501 U.S. 808, 836 (1991)). Moreover, within these parameters,

> victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

Id. (footnote omitted).

We reject Defendant's assertion that Renee Dawson should not have been allowed to testify because of her status as the victim's fiancée.  Defendant contends that there "is no provision in the [capital sentencing] statute for a friend of the victim to testify."  We do not read the statute so narrowly, however.  First, even before passage of the language at issue, we recognized in Nesbit that victim impact evidence was permissible under both the federal and state constitutions.  Id. at 888-90.  Accordingly, as we stated in State v. McKinney, the capital sentencing statute "does not expressly restrict or limit the introduction of other types of victim impact evidence authorized by law developed in our prior cases."  74 S.W.3d 291, 309 (Tenn. 2002).  Rather, the limits on such evidence are qualitative rather than based on genetic or institutional relationships.  Second, the statute

expressly allows for a "representative" of the victim's family to testify. A blood or marital relationship is not a prerequisite for such status. Third, we think that there is a valid distinction to be made between a "friend" and a fiancée with whom the victim had purchased a house and with whom the victim was residing at the time of his murder.[13] Cf. State v. Young, 196 S.W.3d 85, 109-11 (Tenn. 2006) (holding error to admit testimony by victim's professor about the debilitating effects of the murder on an academic department and testimony by the victim's mother about the impact of the murder on victim's "army of friends"). Finally, as did the Court of Criminal Appeals, we note that the Victim's Bill of Rights contemplates that a person residing with a deceased victim may exercise the victim's rights. See Tenn. Code Ann. § 40-38-302(4)(A)(iii)(b) (2003). Accordingly, we hold that it was not error for the trial court to permit Ms. Dawson to testify solely on the basis of her status as the victim's fiancée. See Thomas v. Commonwealth, 559 S.E.2d 652, 661-663 (Va. 2002) (statute defining victim as spouse, parent, sibling or legal guardian did not preclude fiancée from giving victim impact testimony at capital trial).

Having held that the trial court did not err in permitting Ms. Dawson to testify, we also hold that the combination of her testimony with that of Mr. Gordon's brother and son, whose testimony was brief and limited to appropriate topics, was not cumulative or unduly prejudicial, and that its probative value was not substantially outweighed by its prejudicial impact. Defendant is not entitled to relief on this issue.

## V. Prosecution's Closing Arguments

The defense complains that, during closing argument in the sentencing phase of his trial, the prosecution misled the jury about its responsibility in sentencing Defendant; belittled Defendant's mitigation proof; and made inappropriate references to an "angel of death." Initially, we stress that it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument. A contemporaneous objection provides the trial court with an opportunity to assess the State's argument and to caution the prosecution and issue a curative instruction to the jury if necessary.[14] Additionally, defense counsel's failure to object contemporaneously will constitute a waiver of the issue on appeal. See Tenn. R. App. P. 36(a) (providing that an appellate court need not grant relief where party failed to take reasonably available action to prevent or nullify an error); see also State v. Stephenson, 195 S.W.3d 574, 601 (Tenn.

---

[13] We emphasize that we do not decide in this case whether or under what circumstances a murder victim's "friend" may offer victim-impact testimony. The admissibility of victim-impact evidence must be decided under the unique facts and circumstances of each individual case.

[14] Even in the absence of an objection, a trial court may intervene *sua sponte* when prosecutorial argument is clearly improper. See Cauthern, 967 S.W.2d at 737.

55

2006) (appendix); State v. Thomas, 158 S.W.3d 361, 413 (Tenn. 2005) (appendix); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (defendant's failure to object to the State's alleged misconduct during closing argument waives that issue).

In this case, the defense failed to lodge timely objections to the prosecutor's arguments. Our review is therefore limited to the parameters of this Court's discretionary plain error review. See Banks, 271 S.W.3d at 119. We will grant relief for plain error only when five prerequisites are met: "(1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice." Id. at 119-20. It is the defendant's burden to convince this Court that plain error exists, and we need not consider all five factors "when it is clear from the record that at least one of them cannot be satisfied." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007).

*A. Jury's Role in Sentencing Decision*

During its final closing argument, the prosecution told the jury:

> If you vote – And I think it's appropriate, and I'm asking you based upon the law and the evidence to impose the death penalty in this case. You're not putting the Defendant to death. Don't go for that trip. I'm not putting the Defendant to death. The State of Tennessee is not putting that Defendant to death. His actions, his conduct, his repeated conduct is such that makes him responsible for his own conduct and the consequences of that conduct.

The defense made no contemporaneous objection, but now contends that this argument "misled the jury into feeling less responsible than it should be for the sentencing decision that it had to make" and that its verdicts of death therefore failed to meet the "heightened standard of reliability required under the 8th Amendment."

In Caldwell v. Mississippi, the Supreme Court stated that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. 320, 328-29 (1985). In Caldwell, the prosecution argued to the jury that its decision to render a death sentence was "not the final decision. . . . Your job is reviewable. . . . [T]he decision you render is automatically reviewable by the Supreme Court." Id. at 325-26. Additionally, on objection, the trial court endorsed the prosecution's argument, telling the jury, "I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands." Id. at 325.

56

Concluding that "the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death," the United States Supreme Court vacated the death penalty. Id. at 341.

Subsequently, the high court has construed Caldwell as "'relevant only to certain types of comment – those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" Romano v. Oklahoma, 512 U.S. 1, 9 (1994) (quoting Darden v. Wainwright, 477 U.S. 168, 184 n.15 (1986)). Therefore, "'[t]o establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.'" Id. (quoting Dugger v. Adams, 489 U.S. 401, 407 (1989)). See also State v. West, 767 S.W.2d 387, 399 (Tenn. 1989) ("The concerns voiced in Caldwell are triggered when a jury is misled as to its role in the capital sentencing scheme.").

This Court has determined that

[t]he two steps in reviewing an alleged Caldwell violation are determining (1) whether the prosecutor's comments to the jury were such that they would "minimize the jury's sense of responsibility for determining the appropriateness of death" and (2) whether the trial judge in the case sufficiently corrected the impression left by the prosecutor.

West, 767 S.W.2d at 399 (quoting Mann v. Dugger, 844 F.2d 1446, 1456 (11th Cir. 1988)). In West, this Court held that the prosecutor's argument that "the law is self-executing," that the law "provides the punishment, not you, [the jury]," and that "you [the jury] don't impose the sentence, the law provides the sentence, you are merely finders of fact," violated Caldwell. 767 S.W.2d at 399. We held that "[s]uch statements minimize the jury's role and allow[] [the jurors] to feel that the responsibility for a death sentence rests elsewhere." Id. We found the error harmless beyond a reasonable doubt, however, because these

brief erroneous characterizations of the jury's role in determining the appropriateness of a death sentence were sufficiently corrected by the trial judge [in its charge to the jury on its responsibility in determining the death penalty] and the accurate portions of the district attorney's and the defendant's arguments stressing the proper responsibility of the jury.

Id. at 399-400. Similarly, in State v. Cazes, 875 S.W.2d 253 (Tenn. 1994), we found error where the prosecutor told the jury that "the law says it[']s not your decision anymore," that "you're not making the finding of the death penalty. You're finding fact,"

that "the verdict is automatic," and "the law book says what the verdict shall be." Id. at 263-64. We determined the error to be harmless beyond a reasonable doubt, however, because the trial court did not endorse the remarks but rather instructed the jury correctly about its responsibility for determining whether a death sentence was appropriate, and because "other portions of the State's final argument correctly set forth the responsibility of the jury under Tennessee's capital sentencing procedure, and the defendant's final argument repeated and re[i]nforced the State's correct argument." Id. at 264.

Although the prosecution should avoid telling the jury that it is not putting a defendant to death while simultaneously asking the jury to render a sentence of death, the overall message of the quoted portion of the prosecution's argument in this case was that Defendant, himself, took the actions that made a death sentence possible. While seeking to reassure the jury that Defendant was responsible for his own conduct and therefore responsible for facing the ultimate punishment, the prosecution was not, in our view, trying to shift the ultimate authority for *imposing* the death sentence to another entity, as did the prosecution in Caldwell. Rather, we agree with our Court of Criminal Appeals that this type of argument "can just as easily be interpreted as an expression of the [defendant's] burden of responsibility for his own actions." State v. Blanton, No. 01C01-9307-CC-00218, 1996 WL 219609, at *35 (Tenn. Crim. App. Apr. 30, 1996), aff'd, 975 S.W.2d 269 (Tenn. 1998). See also State v. Bush, 942 S.W.2d 489, 517 (Tenn. 1997) (appendix) (observing that "the State may properly argue that a defendant is the 'author of his own fate'" (quoting Wright v. State, No. 01C01-9105-CR-00149, 1994 WL 115955, at *16 (Tenn. Crim. App. Apr. 7, 1994))). We hold that the prosecution's comments did not go so far as to "minimize the jury's sense of responsibility for determining the appropriateness of death." West, 767 S.W.2d at 399.

Further, even if the prosecution's argument crossed the Caldwell line, the trial court corrected any improper impression made by the prosecutor's comments. Before the prosecution began its closing argument, the trial court instructed the jury that "[i]t is now your duty to determine within the limits prescribed by law the penalty which shall be imposed as punishment for these three offenses" and that "[t]he jury is the sole judge of the facts and of the law as it applies to the facts in this case." After closing arguments were finished, the trial court instructed the jury that,

> [i]f you unanimously determine that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the State beyond a reasonable doubt and said circumstance or circumstances have been proven by the State to outweigh any mitigating circumstance or circumstances beyond a reasonable doubt, the sentence shall be death.

The jury therefore knew that it was responsible for deciding whether or not to impose the death penalty on Defendant for each of the murders he committed. The jury was never told by either the trial court or counsel for the parties that an appellate court, or any other person or entity, would be reviewing the jury's decision. Because no substantial right of Defendant's was adversely affected by the challenged argument, Defendant is not entitled to plain error relief on this basis.

*B. Belittling Mitigation Proof*

Defendant also contends that, during closing argument, the prosecution improperly "belittled" the mitigating circumstances. Specifically, he complains about the following remarks:

> What mitigating factors is he pointing to? He expresses remorse. That doesn't make this any better. That doesn't make those three people any less dead. That doesn't take away from the pain and suffering of Larry Taylor and James Goff. "I'm sorry" just won't cut it. That's not going to mitigate the seriousness of this offense and what has happened out there at the TDOT facility. Saying I'm sorry is just not going to get it.

> Now I know his children love him. I would expect that from his children. That doesn't make this any better. Most people's children love them, but that doesn't mean that these three people are any less dead, and that does not mean that these people aren't suffering just the same. That doesn't make it any better. That doesn't make it anymore understandable. It has absolutely nothing to do with what happened out there.

> He adjusted well to prison life. That doesn't make this any better. He might live on in prison. That doesn't weigh anything. That doesn't make this any more understandable.

> Well let me tell you what weighs heavily against all of those mitigating factors in this case. That this Defendant left his house that morning with the intent of murdering his wife in cold blood, and *it had special meaning to him because he was gonna do it with her brother's gun. He had a special purpose there to make sure that when she turned around after being shot in the leg, she knew she was dying with her brother's gun. That's what's weighty in this case.*

> . . .

Depravity of mind. . . . "I'm sorry" doesn't mitigate that. "My children don't want me to die" doesn't mitigate that. "I'll do well in prison" doesn't mitigate that. "I read books while I'm in jail" doesn't mitigate that.

(Emphasis added). We agree with the Court of Criminal Appeals that, for the most part, the prosecutor's remarks were aimed simply at the weight to be given the mitigating circumstances. Such argument is proper. Banks, 271 S.W.3d at 135; State v. Brimmer, 876 S.W.2d 75, 85 (Tenn. 1994).

That portion of the argument we have italicized, however, went beyond simply arguing the weight of mitigating factors. Arguing that the jury should give weight to Defendant's use of Mrs. Jordan's brother's gun was tantamount to arguing that aspect of the crime as an aggravating circumstance. It is improper for a prosecutor to argue non-statutory aggravating circumstances. See Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001) (recognizing that "the State may not rely upon *non-statutory aggravating circumstances* in seeking the imposition of the death penalty"). Moreover, this argument misstated the evidence. The gun which belonged to Mrs. Jordan's brother was the assault rifle. By the time Defendant shot Mrs. Jordan with that gun, she was already dead. She did not, therefore, know that she was "dying with her brother's gun." There was, however, a contemporaneous objection to this argument, and the trial court instructed the jury that "which gun [was] utilized is not an aggravating factor in itself." Additionally, the trial court's instructions made clear that the jury could base a verdict of death only upon its unanimous finding of one or more of the statutory aggravating circumstances charged. Defendant is therefore not entitled to relief on this basis.

### C. "Angel of Death"

At the end of its closing argument during the sentencing phase of Defendant's trial, the defense offered the following quotations to the jury:

"The quality of mercy is not strained. It falls like the gentle rain from heaven upon the place beneath."

"It is twice blessed. It blesses him that gives and him that receives."

"It's the mightiest in the mighty. It becomes the throned monarch better than [h]is crown. His scepter shows the force of earthly power, the tribute to [h]is awe and majesty."

"Wherein doth sit the dread and fear of kings.  But mercy is above this sceptered way.  It is enthroned in the hearts of kings.  It is a tribute to God himself."

And, "Earthly power shows most like God's when mercy seasons justice."

Defense counsel did not identify the source of this quoted material to the jury.[15]

In response, the prosecution argued as follows:

Defense counsel would refer to God as he addresses this jury as he tries to make you feel responsible for doing what you told the State of Tennessee that you would do, and that's follow the law and the instructions of the Court.  And each and every one of you promised, not only this Defendant, but the State of Tennessee that you would follow the instructions of the Court.  That's very important for a legal reason, and I'll state that in a minute.

. . .

Defense counsel would talk about the guilt trip he's putting on you with God and judgment.  Let me tell you, ladies and gentlemen, what takes care and addresses that argument by defense counsel, is rendering unto Caesar that which is Caesar's and unto God, that which is God's.  I represent Caesar, and I have the duty and responsibility, as you do, to follow the instructions given to you by the Court and that codified by the State of Tennessee, and I suggest to you and I tell you, and I know you'll follow that law and instructions given to you by the Court.

. . .

They rely upon part of the testimony of Ms. Fisher, the former girlfriend, one of their, quote, mitigating factors, and I believe she said that Sydney, which would be Renee's child along with the Defendant, made the comment that, "Mama is an angel in heaven looking down on me."  And ladies and gentlemen of the jury, I'm going to suggest to you that *there was another angel involved in this situation, and that angel is the angel of death*.  And the *angel of death* went into that crow's nest a few hours before

---

[15] The author of this text is William Shakespeare.  <u>See</u> <u>The Merchant of Venice</u>, Act iv Sc. 1.

61

Renee came to work, and a few hours before Jerry Hopper just happened to need to have his state truck serviced that day, and just a few hours before Mr. Gordon was involved in an auto accident. And how did the *death angel* know to go there that morning? Because the *death angel* heard the Defendant say on Tuesday, January 11th of '05 at 2:11 a.m., "I'll see you at work, bitch." The *death angel* also heard at 2:17 a.m. the Defendant say, "I hope you go to work tomorrow." So the *death angel* was there and saw everything that happened and everything that's been presented in evidence and *wrote down the aggravating circumstances* that occurred on or about 11:30 a.m. on the birthday of Renee's father.

And these aggravating circumstances are that the Defendant knowingly created a risk of death to two or more persons other than the victim murdered during an act of murder. That will involve, I suggest, ladies and gentlemen, three different counts of this indictment which you will have. That will be the first count, the second count and the third count.

And second, the *angel wrote down that this murder was especially heinous, atrocious or cruel and that it involved serious physical abuse beyond that necessary to produce death*, and that will involve, I think the Court will tell you, the first count involving Renee and the fourth count involving Mr. Gordon and the fifth count of the felony murder indictment of Mr. Gordon.

Now as the *angel sat there and recorded these aggravating circumstances, the angel also wrote down, the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest of the Defendant or another*, and that will apply as you see when you look at the Defendant to Count 2 involving Mr. Hopper and his premeditated murder, and Mr. Hopper, his felony murder count, and Mr. Gordon, the count of his premeditated death, and the fifth count of this indictment, the felony murder of Mr. Gordon. The *angel had a lot to write down and a lot to observe and a lot of things to have to be able to report at a later time.*

And also I submit to you *he wrote down the fourth aggravating circumstance, that the murder was knowingly committed, solicited, directed or aided by the Defendant while the Defendant had a substantial role in committing or attempting to commit first degree murder.* This will encompass the first five counts of this indictment, Renee's premeditated murder, Mr. Hopper's premeditated murder, Mr. Hopper's felony murder, Mr. Gordon's premeditated murder and Mr. Gordon's felony murder.

62

Then the *angel goes and writes down that the Defendant committed mass murder* which is defined as the murder of three or more persons when committed during a single criminal episode, which this was, or at different times within a 48-month period.

And then the last thing that the *angel wrote down which has been preserved for your consideration is that the Defendant knowingly mutilated the body of the victim after death*.

. . .

There's a part of [Defendant's] conduct, deliberate, premeditated. The one that Sydney wrote about, that "My mama is in heaven, an angel," and the one the *death angel wrote about* that's contained by the State of Tennessee in the law and evidence that will be instructed to you about aggravating circumstances.

I even imagine that when the first shot went off and caught Renee in the leg and got her attention, that it really got the attention of the *death angel* who looked and realized that not only did it get Renee's attention but that it had gotten her attention. And then we've got the shot to the head. Who can ever forget that. The *angel will never forget, and that's why it was written down in these instructions*.

. . .

I thank you for your consideration and your attention. It's been difficult. It's difficult for me to make the decision that I thought this was appropriate, but I did much the same, *based upon the information provided by the angel of death*, that delineate and record and file the aggravating circumstances. And I ask that you follow the law and the instructions given to you by the Court and return a verdict that truth dictates and justice demands.

(Emphases added).

Initially, we have no trouble concluding that the prosecution's repeated references to the "angel of death" and the "death angel" as "recording" and "writing down" and "providing" the aggravating circumstances were improper. This argument implied that the aggravating factors alleged to apply to Defendant's murders were somehow delivered

63

from "on high" and possessed the imprimatur of a supernatural being. This implication is, of course, not accurate.

In its brief to this Court, the State disingenuously purports that, "[i]f the 'angel of death' is a religious figure, the State is unaware of the scriptural passage to which it is referable." We are not persuaded. Persons possessing even a casual acquaintance with the Bible recognize that it refers to angels as holy messengers, for instance, the angel Gabriel's announcement to the Virgin Mary of her divine pregnancy. And, as we emphasized in State v. Middlebrooks,

> [w]e have condemned Biblical and scriptural references in a prosecutor's closing argument . . . frequently . . . .
>
> The obvious danger in such references by both prosecutors and defense counsel is the risk that a sentencing decision may be made not upon the facts and the law but on an appeal to the bias or passion of the jury.

995 S.W.2d 550, 559 (Tenn. 1999). While the prosecutor in this case may not have referred specifically to a particular Biblical passage, the repeated references to an angel acting as a messenger were inappropriate allusions to the Christian religion.

This Court has admonished many times that closing arguments must be (1) temperate; (2) predicated on the evidence adduced at trial; and (3) pertinent to the issues. See State v. Hatcher, 310 S.W.3d 788, 813 (Tenn. 2010); State v. Thomas, 158 S.W.3d 361, 413 (Tenn. 2005) (appendix); Middlebrooks, 995 S.W.2d at 557; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994); State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978); Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). Additionally, because a prosecutor's role is to seek justice rather than simply advocate, the State's prerogative during argument is more limited than that of other parties. Thomas, 158 S.W.3d at 413 (appendix). As the United States Supreme Court has recognized,

> [The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor–indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods . . . as it is to use every legitimate means . . . .

Berger v. United States, 295 U.S. 78, 88 (1935). A prosecutor must therefore "refrain from argument designed to inflame the jury." State v. Hall, 976 S.W.2d 121, 158 (Tenn. 1998) (appendix) (quoting Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

The State responds to this issue in its brief to this Court as follows:

The comments were . . . a trope; the prosecution depicted a supernatural figure writing down aggravating circumstances as [Defendant] pursued his course of conduct on January 11, 2005. The use of a literary device, in and of itself, violates no constitutional stricture, and because the aggravators that the prosecution portrayed the "angel" scribbling down were fully supported by the evidence, the argument cannot be viewed as inflammatory.

We disagree that the argument "cannot be viewed as inflammatory" and suggest that the State misses the point. The metaphor utilized by the prosecutor suggested that, while he was shooting the victims, Defendant was accompanied by an angel who, apparently fulfilling some angelic mission, dutifully recorded Defendant's actions in order to later convince a jury to impose the death penalty. This metaphor is inappropriate on its face. We do not consider it temperate, it refers to no evidence in the record, it is not a justifiable inference from any proof in the record, and it is not pertinent to the issues. This argument was improper.

We will not overturn a verdict on the basis of a prosecutor's improper argument unless the impropriety affected the verdict. Sutton, 562 S.W.2d at 823. In conducting this inquiry, we consider five factors:

(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [trial] [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

Taking these factors out of order, we first note that there were no specific curative measures taken by the court or the prosecution. While this would ordinarily weigh against the State, in this case, the defense must also bear some responsibility for failure to object during the prosecutor's argument, which limits our review to a plain error analysis.

65

Combining the first and third factors, we observe that the prosecutor did not begin referring to the "death angel" until the rebuttal portion of his closing argument. The trigger for the prosecutor's improper comments appears to have been the defense's reference to Ms. Fisher's mitigation testimony. The defense described Fisher as Defendant's "friend, who stood by him even after this horrible event" and "throughout this horrible tragedy." In rebuttal closing argument, the prosecutor recalled that Fisher had testified that Defendant's daughter referred to Renee, her murdered mother, as "an angel in heaven." The prosecutor then segued into his "trope" about the angel of death. Thus, the intent of the prosecutor appears to have been to strike back at defense argument. While the prosecutor reached too far in his argument, it appears that the prosecutor was at least trying to place his argument in some overall context triggered by the argument of defense counsel.

We view the fourth and fifth factors in tandem. The strength of the State's case was overwhelming. Defendant's identity as the murderer was never in dispute; thus, the defense made no effort to argue residual doubt. Moreover, not only did the State adduce significant proof of multiple aggravating circumstances as to each victim, but this proof was largely unchallenged. Instead, the defense focused on Defendant's psychological state as mitigation, proof which was strongly challenged by the State. And, although we have identified other trial errors, we have deemed them harmless. Finally, we take note of the trial court's jury charges delivered during the sentencing proceeding. Prior to opening statements, the court told the jury that

> Tennessee statutory law provides that no death penalty shall be imposed unless you find unanimously that one or more specified statutory aggravating circumstances has been proven to you by the State beyond a reasonable doubt, and that the aggravating circumstance or circumstances outweigh the mitigating circumstances beyond a reasonable doubt. These statutory aggravating circumstances are specific circumstances enumerated by the legislature to establish which first degree murders will make a defendant eligible for the death penalty. The State is limited to the statutory aggravating circumstances.

After the parties closed their sentencing proof and prior to closing argument beginning, the trial court instructed the jury as follows:

> It is now your duty to determine within the limits prescribed by law the penalty which shall be imposed as punishment for these three offenses.
>
> Tennessee law provides that a person convicted of murder in the first degree shall be punished by death, imprisonment for life without the

66

possibility of parole or by life – or by imprisonment for life. A defendant who receives a sentence of imprisonment for life shall not be eligible for release until the defendant has served at least 51 full calendar years of his or her sentence. A defendant who receives a sentence of imprisonment for life without parole shall never be eligible for release.

In arising [sic] at this determination, you are authorized to weigh and consider any of the statutory aggravating circumstances proved beyond a reasonable doubt and any mitigating circumstances which may have been raised by the evidence throughout the entire course of this trial, including the guilt-finding phase or sentencing phase or both. The jury is the sole judge of the facts and of the law as it applies to the facts in this case. In arriving at your verdict, you are to consider the law in connection with the facts, but the Court is the proper source from which you are to get the law.

After the trial court instructed the jury as to each of the statutory aggravating factors at issue, it continued:

Members of the jury, the Court has read to you the aggravating circumstances which the law requires you to consider if you find are proved beyond a reasonable doubt. You shall not consider any other facts or circumstances as an aggravating circumstance in deciding whether the death penalty or imprisonment for life without possibility of parole would be appropriate punishment in this case.

Additionally, prior to closing arguments in the guilt/innocence phase of the trial, the court instructed the jury that "[s]tatements, arguments and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." Later in its charge, but still before closing arguments in the guilt/innocence phase, the court reiterated, "[r]emember that the statements of attorneys are not evidence in this case." And, at the commencement of the sentencing phase, the trial judge told the jury, "I will remind you that statements of counsel are not evidence." We presume that the jury follows its instructions. Young, 196 S.W.3d at 111.

Considering the parties' arguments as a whole, the trial court's instructions, and the evidence adduced during the sentencing proceeding of both aggravating and mitigating factors, we hold that the prosecution's references to the "angel of death" did not affect the jury's verdicts. Because Defendant has not demonstrated that any of his substantial rights were adversely affected by the improper argument, he is not entitled to plain error relief on this basis.

## VI. Mandatory Review

In reviewing Defendant's three death sentences, Tennessee Code Annotated section 39-13-206(c)(1) requires this Court to determine (1) whether each sentence "was imposed in any arbitrary fashion"; (2) whether the evidence supports the jury's findings of the aggravating circumstances applicable to each death sentence; (3) whether the evidence supports the jury's determination that the aggravating circumstances outweigh the mitigating circumstances as to each death sentence; and (4) whether each death sentence "is excessive or disproprotionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Tenn. Code Ann. § 39-13-206(c)(1) (2006).

### A. Manner in which Death Sentences were Imposed

In accordance with its instructions, the jury determined unanimously that the State proved beyond a reasonable doubt that several aggravating factors applied to each of the three first degree murders committed by Defendant, and that these aggravating factors outweighed the mitigating circumstances beyond a reasonable doubt. Our close review of the record reveals that the sentencing hearing was conducted pursuant to the applicable statutory provisions and rules of criminal procedure. Accordingly, we conclude that Defendant's three sentences of death were not imposed in an arbitrary fashion.

### B. Evidence Supporting Aggravating Factors

In determining whether the evidence supports the jury's findings of statutory aggravating circumstances, an appellate court must determine, after viewing the evidence in the light most favorable to the State, whether a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt. State v. Rollins, 188 S.W.3d 553, 571 (Tenn. 2006).

### 1. Renee Jordan

In sentencing Defendant to death for his first degree murder of Renee Jordan, the jury applied five aggravating factors. We will address in turn the sufficiency of the proof supporting each factor.

### (i)(3): Risk of Death to Two or More Others

The jury determined that Defendant "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder[ing]" Mrs. Jordan. Tenn. Code Ann. § 39-13-204(i)(3). We have previously determined that

this aggravating circumstance "contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based." State v. Cone, 665 S.W.2d 87, 95 (Tenn. 1984). The proof in this case established beyond a reasonable doubt that, in conjunction with murdering Mrs. Jordan, Defendant murdered two other persons and shot an additional two persons who were fortunate enough to survive. The proof is more than sufficient to support the jury's finding of this aggravating circumstance.

(i)(5): Heinous, Atrocious, or Cruel

The jury also found that Defendant's murder of Mrs. Jordan was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). This Court has defined "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Rollins, 188 S.W.3d 553, 572 (Tenn. 2006) (quoting State v. Pike, 978 S.W.2d 904, 917 (Tenn. 1998); State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985)). And, we have repeatedly considered a defendant's actions in causing the victim to fear death or physical harm as a factor in whether the defendant has created the severe mental pain or anguish relevant to a finding of torture. See, e.g., State v. Carter, 114 S.W.3d 895, 903-04 (Tenn. 2003) (recognizing that "the anticipation of physical harm to oneself is tortuous"); State v. Nesbit, 978 S.W.2d 872, 886-87 (Tenn. 1998); State v. Hodges, 944 S.W.2d 346, 357-58 (Tenn. 1997).

In this case, the proof established that, on the night preceding Mrs. Jordan's murder, Defendant called her repeatedly and left her threatening messages. Additionally, Kenneth Evans testified that Mrs. Jordan called him on that same night, stating that "she was about to have a nervous breakdown," that "she was scared of" Defendant, and that he had been making threatening phone calls to her. Mr. Evans explained that, according to Mrs. Jordan, Defendant had told her that "it didn't matter how many lawyers she had and how much money she had, that what he had for her wasn't going to do her any good." Mrs. Jordan rejected Mr. Evans's suggestion that she go to the police department on the grounds that Defendant would "shoot [her] there whether the police was there or not, and he would probably shoot them, too." Mrs. Jordan went instead to Mr. Evans's house and Mr. Evans hid her car. This proof establishes that Defendant's conduct instilled a significant fear of death in Mrs. Jordan.

In State v. Cooper, 718 S.W.2d 256, 257-60 (Tenn. 1986), this Court considered the defendant's actions in "threaten[ing] and intimidat[ing] [his wife] to the point of distraction for several weeks prior to the homicide" followed by his "deliberate taunting and threatening of [the] victim for hours before shooting at" her to constitute torture for

69

the purpose of the (i)(5) aggravating circumstance. See also State v. Hall, 8 S.W.3d 593, 605 (Tenn. 1999) (in discussing Cooper, noting that "[a]lthough death was instantaneous, or nearly so, this Court found that the defendant's threats and harassment throughout the day had constituted mental torture and depravity of mind"). In this case, Defendant directed similar behavior toward Mrs. Jordan, and his conduct appears to have generated fear in her. Defendant's conduct in following and threatening Mrs. Jordan satisfies the definition of "torture" as utilized in the (i)(5) aggravator.

The proof also establishes that Defendant murdered Mrs. Jordan during his initial shooting spree with a handgun. According to Mr. Goff and Mr. Taylor, when Defendant entered the crow's nest the first time, he called Mrs. Jordan's name to get her attention. According to Defendant's statement, he shot Mrs. Jordan in the leg to get her attention. Defendant's statement is corroborated by the autopsy, which identified a gunshot wound to Mrs. Jordan's right thigh. In either event, Defendant got Mrs. Jordan's attention and then fired another shot. According to both Goff and Taylor, this second shot struck Mrs. Jordan in the torso, as did the next (third) shot. Defendant was standing near the crow's nest door when he fired these first three shots. Goff said Defendant was about six feet from Mrs. Jordan.

Defendant continued shooting Mrs. Jordan, striking her twice in the head. One of these two gunshots was to Mrs. Jordan's forehead, from no more than one foot away. The other gunshot was to the back of Mrs. Jordan's head. Defendant told the police that the last shot he fired at Mrs. Jordan from his handgun was to the "top of [her] head." According to both Goff and Taylor, Mrs. Jordan did not survive these gunshots to her head. Medical testimony confirmed that each of these gunshots to Mrs. Jordan's head were fatal.

The forensic pathologist who performed the autopsy on Mrs. Jordan's body identified eleven gunshot wounds. From these wounds, three handgun bullets were recovered, including one from the close range shot to Mrs. Jordan's forehead, one from her thigh, and one from her abdomen. A fourth handgun bullet was recovered from her clothing. The forensic pathologist could not determine the type of weapon that fired the shot through the top of Mrs. Jordan's head, which bullet exited through Mrs. Jordan's face, but Defendant's statement establishes that this wound was inflicted during the initial assault with the handgun. The proof therefore establishes that Defendant shot Mrs. Jordan at least five times during the act of murdering her: once to her leg, twice to her torso, and twice to her head. Four of these wounds were inflicted after Defendant got her attention to make sure that she realized he was going to kill her. The proof also establishes that the wound to Mrs. Jordan's forehead was inflicted after Defendant had shot her once in the leg and twice in the torso. Obviously, given the proof that this wound was inflicted from no more than one foot away, Defendant had to advance upon Mrs.

70

Jordan as she lay incapacitated from the first several gunshots in order to inflict this fatal shot.

In spite of having inflicted two fatal head wounds to Mrs. Jordan, Defendant left the crow's nest and returned with an assault rifle after having murdered Mr. Gordon. He then shot Mrs. Jordan's body several more times. Dr. Turner identified at least four gunshot wounds as having been inflicted by an assault rifle.

This proof is sufficient to establish that Defendant's murder of Mrs. Jordan involved "serious physical abuse beyond that necessary to produce death." See Odom, 928 S.W.2d at 25 n.5 (declining to limit serious physical abuse to that caused before death). The proof is therefore sufficient on two bases to support the jury's finding of this aggravating circumstance.

### (i)(7): Felony Murder

The jury found that Defendant "knowingly committed, solicited, directed, or aided" Mrs. Jordan's murder "while [he] had a substantial role in committing or attempting to commit . . . first degree murder." Tenn. Code Ann. § 39-13-204(i)(7). Defendant argues that the evidence does not support this aggravating circumstance because Mrs. Jordan was already dead before he shot anyone else. We are not persuaded. Defendant's actions in shooting all four people in the crow's nest were of a piece. The application of this aggravating circumstance does not hinge on the order in which the victims died or were shot. Moreover, Defendant admitted in his statement that he shot Mr. Goff when Mr. Goff attempted to interrupt his attack on Mrs. Jordan. The evidence is therefore sufficient to demonstrate that Defendant killed Mrs. Jordan "while" he was committing Mr. Goff's attempted murder.

Defendant also complains about the trial court's instructions regarding the mens rea element of this aggravating circumstance. The trial court instructed the jury as follows:

> Knowingly means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. The requirement of knowingly is also established if it is shown that the Defendant acted intentionally.

71

Intentionally means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the results.

Defendant contends that these definitions "should not have been included within the aggravator" because it lessened the State's burden of proof as described in State v. Page, 81 S.W.3d 781, 787-88 (Tenn. Crim. App. 2002). However, this Court rejected the claim that a superfluous definition of "knowingly" lessens the burden of proof in State v. Faulkner, 154 S.W.3d 48, 59 (Tenn. 2005).

Defendant also argues that these definitions "gave the jury much more lee-way to find these felony murder aggravators," and that including the definitions within the instruction on the aggravating circumstance "amount[ed] to amending th[e] aggravating circumstance to make it unconstitutionally overbroad and vague." We disagree.

In State v. Rogers, 188 S.W.3d 593, 618 (Tenn. 2006), the defendant made the opposite argument: that the trial court tainted the jury's finding of the (i)(7) aggravator by failing to instruct the jury on the definition of "knowingly." We noted that, when it convicted the defendant of first degree premeditated murder, the jury necessarily determined that the defendant acted intentionally with regard to the result of his conduct. Id. The finding that a defendant acted intentionally also necessarily establishes that the defendant acted knowingly. See Tenn. Code Ann. § 39-11-301(a)(2) (2003). Accordingly, we held that any error in the trial court's failure to define "knowingly" within the instruction on this aggravating circumstance was harmless beyond a reasonable doubt. Rogers, 188 S.W.3d at 618. Similarly, we hold that any error by the trial court in its instructions on this aggravating circumstance in this case was harmless beyond a reasonable doubt. The jury had already determined that Defendant had committed three premeditated murders and two attempted premeditated murders. By doing so, it necessarily concluded that Defendant acted intentionally when shooting all five of his victims. The definition of knowing was therefore, at most, surplusage and did not affect the jury's verdict. See Faulkner, 154 S.W.3d at 60-61.

Moreover, we note that the term "knowingly" is used in the (i)(7) aggravating circumstance to modify the words "committed, solicited, directed or aided." Each of these words refers to a type of conduct, but not necessarily to the result of the conduct. Accordingly, it is not necessarily erroneous for a trial court to charge the "nature of conduct" definition of "knowingly" in conjunction with the (i)(7) aggravator.

As the fourth aggravating circumstance, the jury found that Defendant committed "mass murder," defined as "the murder of three (3) or more persons whether committed during a single criminal episode or at different times within a forty-eight-month period." Tenn. Code Ann. § 39-13-204(i)(12).  The jury convicted Defendant of murdering Mrs. Jordan, Mr. Hopper, and Mr. Gordon on the same day and during the same criminal episode.  The proof is more than sufficient to support the jury's application of this aggravating factor.

## (i)(13):  Mutilation of Body

The jury found as a fifth and final aggravating circumstance that Defendant "knowingly mutilated the body" of Mrs. Jordan after her death.  Tenn. Code Ann. § 39-13-204(i)(13).  In support of this aggravator, the State relied on Defendant's return to the crow's nest after killing Mrs. Jordan to shoot her body repeatedly with the SKS assault rifle.

This Court has not previously addressed in detail the use of this aggravating circumstance to impose the death penalty.[16]  In at least two cases, however, our Court of Criminal Appeals considered its use in the imposition of a sentence of life without parole. See State v. Thompson, 43 S.W.3d 516, 525-26 (Tenn. Crim. App. 2000), perm. appeal denied (Tenn. Mar. 5, 2001); State v. Price, 46 S.W.3d 785, 827-28 (Tenn. Crim. App. 2000), perm. appeal denied (Tenn. Feb. 26, 2001).  In both cases, the court noted that mutilation is not statutorily defined and so turned to the dictionary definition of mutilation as "'to cut up or alter radically so as to make imperfect.'"  Thompson, 43 S.W.3d at 525 (quoting Webster's Third New International Dictionary, 1493 (1993)); Price, 46 S.W.3d at 827 (same).  The court also noted in both cases that "the legislative intent underlying mutilation as an aggravating circumstance must be 'that the General Assembly . . . meant to discourage corpse desecration.'"  Thompson, 43 S.W.3d at 525-26 (quoting Price, 46 S.W.3d at 828).  In Thompson, the court concluded that the proof supported this aggravating circumstance where, after the victim's death, the defendant "stabbed him four times in the back with a knife, slit his throat, cut his forehead and legs, and fractured both of his legs by exerting great pressure from behind."  43 S.W.3d at 526.  In Price, the court concluded that the defendant's post-mortem infliction of flash burns on his murder victim's face satisfied the definition of mutilation.  46 S.W.3d at 828.

---

[16] In State v. Davidson, 121 S.W.3d 600, 621 (Tenn. 2003), we affirmed without discussion the jury's application of the mutilation aggravator where the defendant sliced open his victim's body from neck to abdomen.

We recognize that the term "mutilation" is most frequently used to describe activities that are more obviously disfiguring to a victim's body than multiple gunshot wounds. See, e.g., Terry v. State, 46 S.W.3d 147, 161, 166 (Tenn. 2001) (referring to defendant's actions in cutting off victim's head and right forearm after killing him and burning the body as "mutilation" in discussion of (i)(5) aggravator); State v. Harris, 989 S.W.2d 307, 311 (Tenn. 1999) (victim's body "mutilat[ed]" where body parts severed and heart removed; (i)(5) aggravator alleged). Nevertheless, we hold that the circumstances of this case are sufficient to support the jury's finding of this aggravating factor. During his initial assault on his wife, Defendant shot two bullets into Mrs. Jordan's head. Medical proof established that each of these wounds was fatal, and Mr. Goff and Mr. Taylor both testified that Mrs. Jordan appeared dead at the time they were still in the crow's nest. Certainly it is reasonable to infer that Defendant thought she was dead. After murdering his wife, Defendant left the crow's nest and walked to his truck. There, he murdered another person. Unfinished, Defendant carried his assault rifle back to the crow's nest. He had a brief conversation with Mr. Taylor. Only after Mr. Taylor had left the crow's nest, descended the steps, and turned the corner did Defendant open fire on Mrs. Jordan's body. These circumstances support the inference that Defendant was intent on desecrating Mrs. Jordan's corpse. He did so by firing several high-powered bullets into her body. Although these bullets did not succeed in severing any of Mrs. Jordan's body parts, they caused a great deal of damage. Freddie Ellison described Mrs. Jordan as being "shot all to pieces." Dr. Turner described the assault rifle gunshot wounds to Mrs. Jordan's ribs, right lung, diaphragm, liver, kidney, spinal column, and back muscles. We hold that the multiple gunshot wounds that Defendant inflicted after Mrs. Jordan's death "alter[ed] radically so as to make imperfect" her body. The proof is sufficient to support the jury's application of this aggravating factor.

## 2. Jerry Hopper

With respect to Defendant's first degree murder of Jerry Hopper, the jury found four aggravating circumstances. We will address in turn the sufficiency of the proof supporting each factor.

### (i)(3): Risk of Death to Two or More Others

As it did with Defendant's murder of Mrs. Jordan, the jury determined that Defendant "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder[ing]" Mr. Hopper. Tenn. Code Ann. § 39-13-204(i)(3). While Defendant was murdering Mr. Hopper, he was also shooting Mr. Goff and Mr. Taylor. The evidence is therefore sufficient to support this aggravating circumstance.

74

### (i)(6): Murder to Avoid Apprehension

The jury also found that Defendant murdered Mr. Hopper "for the purpose of avoiding, interfering with, or preventing [his] lawful arrest or prosecution." Tenn. Code Ann. § 39-13-204(i)(6). The Court of Criminal Appeals concluded that the proof is not sufficient to support application of this aggravating factor. We agree.

This aggravating circumstance "focuses on a defendant's motives in committing a murder." State v. Reid, 164 S.W.3d 286, 315 (Tenn. 2005). Thus, while it need not be his sole motive in committing the murder, id. at 316, there must be some "particular proof" that Defendant murdered the victim at least in part to avoid apprehension, State v. Hartman, 42 S.W.3d 44, 58 (Tenn. 2001). In this case, the State argues that the necessary proof is provided by Defendant's statement that, after he shot Mrs. Jordan, "[t]he guy that was sitting in the corner got up and came at me. I shot him and he fell to the floor." We fail to see how this statement establishes that Defendant shot Hopper to avoid his apprehension, particularly in light of Defendant's deliberate and unhurried conduct throughout his murderous spree. Rather, this statement suggests that Defendant did not want to be interrupted in his mission to take his wife's life. We note particularly that Defendant allowed Mr. Taylor to leave the crow's nest in spite of his familiarity with Defendant and his witnessing of Defendant's murders. The evidence is not sufficient to support the application of this aggravating circumstance.

### (i)(7): Felony Murder

The jury also found that Defendant murdered Mr. Hopper while committing or attempting to commit first degree murder. See Tenn. Code Ann. § 39-13-204(i)(7). The proof is sufficient to support this aggravating circumstance. In conjunction with shooting Mr. Hopper, Defendant also shot Mrs. Jordan, Mr. Goff and Mr. Taylor, for which the jury convicted him of first degree murder and two counts of attempted first degree murder.

### (i)(12): Mass Murder

The jury also applied as an aggravating factor that Defendant committed "mass murder." Tenn. Code Ann. § 39-13-204(i)(12). For the reasons set forth above, the proof supports application of this aggravating circumstance.

### 3. David Gordon

The jury applied four aggravating circumstances in determining to impose the death penalty on Defendant for his murder of David Gordon. We examine in turn the sufficiency of the proof in support of each of these aggravators.

#### (i)(5): Heinous, Atrocious, or Cruel

As it did with Defendant's murder of Mrs. Jordan, the jury found that Defendant's murder of Mr. Gordon was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). The testimony established that Defendant shot Mr. Gordon at least thirteen times with a fully automatic high-powered assault rifle. Some of these shots were fired after Mr. Gordon was face down on the ground. Medical testimony described Mr. Gordon's intestines as "morselized," and the pathologist stated that there were more wounds than necessary to inflict death and that the wounds were painful. The proof is sufficient to support the jury's application of this aggravating circumstance.

#### (i)(6): Murder to Avoid Apprehension

The jury also found that Defendant murdered Mr. Gordon "for the purpose of avoiding, interfering with, or preventing [his] lawful arrest or prosecution." Tenn. Code Ann. § 39-13-204(i)(6). We hold that the evidence is not sufficient to support application of this aggravating circumstance. There is no "particular proof" in the record demonstrating that Defendant murdered Mr. Gordon in order to prevent his apprehension. Rather, the proof supports the inference that Defendant murdered Mr. Gordon for the same reason he murdered Mr. Hopper: because Mr. Gordon was interfering with his mission to murder his wife and mutilate her body. Before returning to the crow's nest with his assault rifle, Defendant was intercepted by Mr. Gordon. Defendant warned Mr. Gordon to get out of his way. When Mr. Gordon remained in Defendant's way, Defendant removed him with a spray of gunfire. Defendant then proceeded with the remainder of his mission; notably, he did not flee the area after shooting Mr. Gordon in front of numerous witnesses.

The evidence is not sufficient to support the application of this aggravating circumstance.

#### (i)(7): Felony Murder

The jury also found that Defendant murdered Mr. Gordon while committing or attempting to commit first degree murder. Tenn. Code Ann. § 39-13-204(i)(7). The

76

proof is sufficient to support this aggravating circumstance. Defendant murdered Mr. Gordon in conjunction with his murders of Mrs. Jordan and Mr. Hopper and in conjunction with his attempted murders of Mr. Goff and Mr. Taylor.

### (i)(12): Mass Murder

The jury also found that Defendant's murder of Mr. Gordon was part of a "mass murder." See Tenn. Code Ann. § 39-13-204(i)(12). The proof that Defendant shot and killed Mrs. Jordan, Mr. Hopper, and Mr. Gordon on January 11, 2005, is sufficient to support the application of this aggravating circumstance.

### C. Weighing of Aggravating and Mitigating Circumstances

### 1. Duplicitous Aggravating Circumstances

As set forth above, this Court is statutorily required to review as to each death sentence whether the evidence supports the jury's determination that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. Defendant argues that the multiple aggravating circumstances were "overlapping" and "duplicitous" and that the felony murder, mass murder, and great risk to two or more persons aggravating circumstances "were so intertwined factually in this case that they would be given too much weight when each was separately considered resulting in a death sentence from an unreliable weighing process." We disagree.

"[A]ggravating circumstance[s] must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 877 (1983); see also Banks, 271 S.W.3d at 154. This Court has recognized that,

> [i]n addition to providing a public declaration of the state's policies regarding the offenses deemed to warrant the use of the death penalty, legislatively created guidelines can also serve to channel the discretion of jurors in determining whether the death penalty is appropriate in a particular case. Thus, they prevent the wanton and freakish imposition of the death penalty.

Banks, 271 S.W.3d at 154 (citation omitted).

The aggravating circumstances at issue in this case each "meet the constitutional requirements of narrowing the class of death penalty eligible persons and channeling juror

discretion." Id. Contrary to Defendant's contention, they are not duplicitous. Each of the five aggravating circumstances properly applied by the jury relies upon different policy justifications for rendering a murderer eligible for the death penalty. Moreover, that the same conduct may satisfy certain elements of different aggravating circumstances does not contaminate the jury's sentencing process, or invalidate its weighing process. As conceded by Defendant, neither the Supreme Court nor this Court has ruled unconstitutional the use of the same evidence to satisfy elements of different, otherwise valid aggravating circumstances. See Jones v. United States, 527 U.S. 373, 398-400 (1999); Hall, 958 S.W.2d at 692. We again decline to do so.

## 2. Weighing: Each Victim

### Renee Jordan

We turn now to our inquiry of whether a reasonable juror could find beyond a reasonable doubt that the five aggravating circumstances proved by the State with respect to Mrs. Jordan's murder outweigh the mitigating circumstances. The proof supporting the aggravating circumstances is set forth above. Mitigating circumstances instructed to the jury included (1) Defendant committed the murder while under the influence of extreme mental or emotional disturbance; (2) Defendant's capacity to appreciate the wrongfulness of his conduct or to conform to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment; (3) Defendant had adjusted well to the structure of prison life; (4) Defendant expressed remorse, accepted responsibility for his actions, and is willing to accept punishment for his crimes; (5) Defendant has a loving and supportive family; and (6) any other aspect of Defendant's character or record, or any aspect of the circumstances of the offense favorable to Defendant which is supported by the evidence.

In addition to proving aggravating circumstances, the State adduced significant evidence that contradicted much of Defendant's mitigation proof. Accordingly, we hold that a rational juror could easily have concluded that the five aggravating circumstances proved by the State outweighed the various mitigating circumstances.

### Jerry Hopper

With respect to the death sentence imposed on Defendant for his murder of Jerry Hopper, we have held that one of the four aggravating circumstances found by the jury – that Defendant committed the murder to avoid apprehension – is not supported by sufficient evidence. We may uphold a death sentence in spite of the erroneous application of an aggravating circumstance when we are convinced beyond a reasonable

doubt that the jury would have imposed the same sentence absent its consideration of the invalid aggravator. See State v. Howell, 868 S.W.2d 238, 259 (Tenn. 1993). In conducting this inquiry, we must

> completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

Id. at 260-61.

Invalidation of the (i)(6) aggravator leaves three remaining aggravating circumstances found by the jury as to Defendant's murder of Jerry Hopper. The evidence in support of each of these three remaining aggravators is exceptionally strong. In contrast, the evidence supporting the (i)(6) aggravator was slight, and the prosecution did not stress this circumstance during its sentencing argument. The nature, quality and strength of the mitigating evidence was hotly contested with a "battle of the experts." Our complete examination of the record reveals error in conjunction with Dr. Matthews's testimony; the exclusion of Defendant's parents's testimony at the sentencing hearing; and improper argument by the prosecution. Nevertheless, we have determined that these errors had no prejudicial impact on the jury's verdicts. In light of our analysis under Howell, we conclude that the jury's erroneous consideration of the (i)(6) aggravating factor was harmless beyond a reasonable doubt and that the jury would have imposed the death penalty on Defendant for his murder of Mr. Hopper even had it given no weight to the (i)(6) aggravating circumstance. Moreover, we also hold that a rational juror could easily have concluded that the three aggravating circumstances properly applied to Defendant's murder of Mr. Hopper outweighed the mitigating circumstances beyond a reasonable doubt.

### David Gordon

For the same reasons we have determined that the jury would have imposed the death penalty for Defendant's murder of Mr. Hopper had it given no weight to the (i)(6) aggravating factor, we hold that its erroneous application of the (i)(6) aggravating circumstance in the imposition of the death penalty for Defendant's murder of Mr. Gordon is harmless beyond a reasonable doubt. We also hold that a rational juror could easily have concluded that the three aggravating circumstances properly applied to Defendant's murder of Mr. Gordon outweighed the mitigating circumstances beyond a reasonable doubt.

79

*D. Proportionality Review*

We next consider whether the sentences imposed in this case are excessive or disproportionate to the penalty imposed in similar cases. This review identifies aberrant, arbitrary, or capricious sentencing by determining whether the death sentence is "'disproportionate to the punishment imposed on others convicted of the same crime.'" State v. Bland, 958 S.W.2d 651, 662 (Tenn. 1997) (quoting Pulley v. Harris, 465 U.S. 37, 43 (1984)). We begin with the presumption that a death sentence is proportional with the crime of first degree murder. Hall, 976 S.W.2d at 135. In conducting this review, we employ the precedent-seeking method of comparative proportionality review, in which we compare this case with other cases involving similar defendants and similar crimes. Bland, 958 S.W.2d at 665-67. While no defendants or crimes are identical, a death sentence is disproportionate if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668. Our inquiry, however, does not require a finding that "a sentence less than death was never imposed in a case with similar characteristics." Id. at 665. This Court has repeatedly held that "the pool of cases considered by this Court in its proportionality review includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." Reid, 164 S.W.3d at 316.

In reviewing the applicable pool of cases, we consider numerous factors about each of the three murders, including:

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

Id. Additionally, we consider numerous factors about Defendant including:

> (1) prior criminal record [or activity], if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in [each] murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of [each] victim's helplessness; and (8) potential for rehabilitation.

Id. at 316-17.

80

In this case, the proof established that Defendant and Mrs. Jordan were having marital problems. On the morning of January 11, 2005, Mrs. Jordan told Defendant over the phone that he and his two daughters needed to leave the marital residence. Mrs. Jordan hung up before Defendant could respond, making his "blood boil." Defendant gathered several of his many weapons, including two handguns, a fully automatic assault rifle, and a shotgun, together with numerous rounds of ammunition, and loaded these items into the cab of his truck. He drove to the TDOT garage where Mrs. Jordan worked, hitting another vehicle on his way. Once he arrived as his wife's place of employment, Defendant walked up the stairs and into the crow's nest where his wife worked, walking past several people on his way. He had armed himself with one handgun in a holster and another handgun in the small of his back.

Upon walking into the crow's nest through the only door, Defendant surveyed the room and adopted a police stance. Mrs. Jordan was facing away from him and talking on the phone. Defendant drew one of his pistols and, to get his wife's attention, called her name and shot her in the leg. As she turned to face him, he shot her twice more in the torso. He shot her again through the back of her head, and he also walked up and placed the muzzle of his handgun within a foot of her forehead and pulled the trigger.

Three other men were present in the office while Defendant was murdering his wife. When Jerry Hopper rose to try and stop Defendant, Defendant shot him three times. Defendant then shot James Goff four times. By this time, Larry Taylor had dived under a desk, leaving his legs exposed. Defendant shot Larry Taylor twice in the legs as he left the crow's nest.

Returning to his truck, Defendant was confronted by the man who had been driving the car he hit on the way to the garage. Defendant told Mr. Gordon to leave. When Mr. Gordon persisted, Defendant retrieved his fully automatic assault rifle from his truck and shot Mr. Gordon. Defendant continued to shoot Mr. Gordon after he fell to the pavement, inflicting at least thirteen gunshot wounds. Several of these were to Mr. Gordon's backside.

Finished with Mr. Gordon, Defendant returned to the crow's nest with his assault rifle. After dismissing Larry Taylor from the office, Defendant opened fire on his wife's body. There is no proof that he attempted to render any aid to Mr. Hopper, who remained in the crow's nest and was still alive. Defendant then walked to his truck and left the TDOT garage. Defendant did not stop to render aid to Mr. Gordon. Defendant initially tried to evade the police, but was cooperative once he was taken into custody.

Defendant was forty years old when he committed these crimes. He is twice divorced and has four daughters, one with victim Mrs. Jordan. He has no prior criminal

81

convictions. One expert witness diagnosed him with dissociative disorder, major depressive disorder, generalized anxiety disorder, alcohol abuse, and borderline personality disorder. He had been drinking alcohol at the time of the crimes. While he initially attempted to evade the police, he was cooperative after his apprehension. He was remorseful. His children and family members loved him. Several persons testified about his good behavior while jailed and opined that he would be a model prisoner.

This Court has upheld the death sentence in numerous cases involving the defendant's murder of his wife or girlfriend. See, e.g., State v. Ivy, 188 S.W.3d 132 (Tenn. 2006) (defendant shot estranged girlfriend multiple times because she was going to bring charges of domestic abuse against him; prior violent felony and murder to avoid apprehension aggravating circumstances); Faulkner, 154 S.W.3d 48 (defendant struck wife repeatedly in head with iron skillet; prior violent felony aggravator); State v. Suttles, 30 S.W.3d 252 (Tenn. 2000) (defendant stabbed girlfriend in parking lot; prior violent felony and heinous, atrocious, or cruel aggravating circumstances); State v. Keough, 18 S.W.3d 175 (Tenn. 2000) (defendant stabbed wife after argument in bar and left her to bleed to death in car; prior violent felony aggravator); State v. Hall, 8 S.W.3d 593 (Tenn. 1999) (after arguing with wife, defendant beat, strangled, and drowned her; heinous, atrocious, or cruel aggravator); State v. Hall, 958 S.W.2d 679 (Tenn. 1997) (angry that girlfriend left him, defendant set fire to her car while she was inside; heinous, atrocious, or cruel and felony murder aggravators); State v. Smith, 868 S.W.2d 561 (Tenn. 1993) (defendant stabbed and shot estranged wife; heinous, atrocious, or cruel and mass murder aggravators); State v. Johnson, 743 S.W.2d 154 (Tenn. 1987) (defendant suffocated wife with plastic bag; prior violent felony and heinous, atrocious, or cruel aggravators); State v. Miller, 674 S.W.2d 279 (Tenn. 1984), on remand, 771 S.W.2d 401 (Tenn. 1989) (defendant beat girlfriend to death with fists and fire poker and then stabbed her numerous times; death sentence upheld under heinous, atrocious, or cruel aggravator).

This Court has also upheld the death sentence where the defendant committed mass murder. See, e.g., Reid, 213 S.W.3d 792 (defendant shot and killed three victims during robbery of fast food restaurant; prior violent felony, murder to avoid apprehension, felony murder, and mass murder aggravators); State v. Holton, 126 S.W.3d 845 (Tenn. 2004) (defendant shot and murdered his four children; mass murder and, as to three victims, under-twelve -years-old aggravators); State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000) (defendants shot two men, strangled the mother of one of the men, and buried all three victims alive; prior violent felony, heinous, atrocious, or cruel, felony murder, and mass murder aggravators); Smith, 868 S.W.2d 561 (defendant shot and stabbed his wife and two stepsons; heinous, atrocious, or cruel, murder to avoid apprehension, felony murder, and mass murder aggravators); State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993) (defendant actively participated in restaurant robbery in which three persons were killed; heinous, atrocious, or cruel and mass murder aggravators).

82

We have also upheld death sentences imposed on defendants with little or no prior criminal history and/or psychological problems. See, e.g., State v. Pike, 978 S.W.2d 904 (Tenn. 1998) (defendant selected victim to murder, bludgeoned her to death, mutilated body and kept piece of skull as souvenir; no prior criminal record and proof of emotional or mental disturbance at time of crime; heinous, atrocious, or cruel and murder committed to avoid apprehension aggravators); Hall, 958 S.W.2d 679 (defendant doused girlfriend with gasoline, locked her in vehicle and set her on fire; no prior criminal convictions but prior illegal substance abuse and proof of personality disorder; heinous, atrocious, or cruel and felony murder aggravators); Bush, 942 S.W.2d 489 (defendant savagely beat and stabbed seventy-nine-year-old acquaintance to death and later boasted of murder; no criminal record and proof of mental disease; heinous, atrocious, or cruel and murder committed to avoid apprehension aggravators); Smith, 868 S.W.2d 561 (defendant murdered his wife by shooting her twice, slashing her throat, and stabbing her with an ice pick; murdered two stepsons by shooting and stabbing; proof of personality disorders; heinous, atrocious, or cruel, murders committed to avoid apprehension, felony murder, and mass murder aggravators); State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985) (defendant shot two victims and slashed their throats; no prior criminal record; heinous, atrocious, or cruel and felony murder aggravators); State v. Melson, 638 S.W.2d 342 (Tenn. 1982) (defendant beat victim to death with hammer blows to head after victim discovered defendant's theft; no significant prior criminal history; heinous, atrocious, or cruel and murder committed to avoid apprehension aggravators).

We have upheld death sentences where the defendant presented proof that he was a model prisoner. See, e.g., Banks, 271 S.W.3d 90 (defendant shot two persons during a home robbery, killing one of them; murder committed to avoid apprehension and felony murder aggravators); Austin, 87 S.W.3d 447 (defendant hired another to kill victim; hiring another to commit murder for remuneration aggravator); Terry, 46 S.W.3d 147 (defendant shot and killed victim; heinous, atrocious, or cruel and murder to avoid apprehension aggravators); Cauthern, 967 S.W.2d 726 (defendant strangled victim to death; heinous, atrocious, or cruel aggravator). We have also upheld death sentences where the defendant cooperated with the police and expressed remorse for the crimes. See, e.g., Young, 196 S.W.3d 85 (defendant stabbed victim to death; prior violent felonies, murder to avoid apprehension, and felony murder aggravators); State v. Cole, 155 S.W.3d 885 (Tenn. 2005) (defendant shot victim twice, killing him; prior violent felony aggravator); State v. Irick, 762 S.W.2d 121 (Tenn. 1988) (defendant raped and murdered child; victim less than twelve years old, heinous, atrocious, or cruel, murder to avoid apprehension, and felony murder aggravators).

Our close review of the entire record in this case, together with our review of these and other cases in which the death penalty was imposed and upheld, convinces us that the death penalties imposed in this case for Defendant's brutal murders of Renee Jordan, Jerry Hopper, and David Gordon, are not disproportionate to the penalty imposed for similar crimes.

## VII. Cumulative Error

Our close review of the record in this case has revealed several trial errors. We have determined that none of these errors, considered singularly, requires reversal of either Defendant's convictions or any of his death sentences. However, "the combination of multiple errors may necessitate the reversal of a death penalty even if individual errors do not require relief." State v. Cribbs, 967 S.W.2d 773, 789 (Tenn. 1998). Considering the cumulative effect of the errors we have identified and discussed, and considering all of the evidence adduced in this case, we are confident that the combined effect of the trial errors had no impact on the jury's verdict at either the guilt/innocence phase or the sentencing phase of Defendant's trial. Defendant is therefore entitled to no relief on this basis.

## CONCLUSION

In accordance with Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions, we have considered the entire record in this case and conclude that the sentences of death have not been imposed arbitrarily, that the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, and that the sentences are not excessive or disproportionate.

We have reviewed all of the issues raised by Defendant and conclude that they do not warrant relief. With respect to issues that were raised in this Court but not addressed in this opinion, including the sufficiency of the evidence supporting Defendant's convictions; the failure to videotape Defendant's statements; the destruction of Defendant's urine and blood samples; the admission of photographs; the jury instructions as to a finding that the aggravating circumstances outweigh the mitigating circumstances; and the constitutionality of Tennessee's lethal injection procedure and protocol; we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are incorporated herein and attached as an appendix. Defendant's convictions and sentences, including all three sentences of death, are affirmed.

The sentences of death shall be carried out as provided by law on the 27th day of September, 2011, unless otherwise ordered by this Court or other proper authority. It appearing that Defendant David Lynn Jordan is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE

## APPENDIX

(Excerpts from the Decision of the
Court of Criminal Appeals)

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 9, 2008 Session

STATE OF TENNESSEE v. DAVID LYNN JORDAN

Direct Appeal from the Circuit Court for Madison County
No. 05-431    Roy B. Morgan, Jr., Judge

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

George Morton Googe, District Public Defender, Jackson, Tennessee, and Lloyd Tatum, Henderson, Tennessee, for the appellant, David Lynn Jordan.

Robert E. Cooper, Jr., Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## ANALYSIS

### I. Guilt Phase Issues

### A. Sufficiency of the Evidence

The defendant does not challenge the sufficiency of the evidence to support his convictions for first degree murder.[2]  Notwithstanding, we have reviewed the evidence introduced at trial and conclude that there is sufficient evidence contained in the record to support a finding by the trier of fact that the defendant was guilty of first degree murder on all three counts beyond a reasonable doubt.  Tenn. R. App. P. 13(e).

---

[2]The defendant also did not challenge the sufficiency of the evidence for his convictions of attempted first degree murder and leaving the scene of an accident.

86

## II. Penalty Phase Issues

### A. Failure to Videotape Statements

The defendant contends that his rights to a fair trial, including his right to confrontation, were violated by the interpretations of his confession to the investigator which was not videotaped. Investigator Tyreece Miller testified that the defendant was not under the influence at the time of his interview. He added that the defendant was bragging and proud. The defendant asserts that the police department had video recording equipment. At trial, Investigator Miller testified that it would have been against standard operating procedure for him to take the video equipment to the Criminal Justice Complex. As a result, the defendant's statement was comprised of the answers to the questions Investigator Miller asked him, which Miller wrote down. The defendant argues that had the jurors been privy to the defendant's actual demeanor when giving his statement, they could have determined for themselves if the expressions of the defendant were really those of regret rather than bragging. The defendant concludes that the denial of electronic or video recording denied the trier of fact an essential tool in determining a life or death sentence.

In State v. Rollins, 188 S.W.3d 553, 564-65 (Tenn. 2006), our supreme court held that there was no state or federal constitutional right requiring the electronic recording of interrogations. Indeed, the court wrote:

> In State v. Godsey, 60 S.W.3d 759 (Tenn. 2001), this Court rejected the argument that failing to electronically record interrogations requires suppression of any statements resulting from the interrogations. We acknowledged that courts in Alaska and Minnesota require interrogations to be electronically recorded, id. at 771, but we pointed out that courts in fifteen other states had refused to impose such a requirement, id. at 772 n.7. More importantly, we emphasized that "neither the state nor the federal constitution requires electronic recording of interrogations." Id. at 771.
>
> Although we found no constitutional or statutory authority mandating that interrogations be electronically recorded, we recognized in Godsey that such a rule would reduce the amount of time spent in court resolving disputes over what occurred during interrogations and relieve the judiciary of the burden of resolving such disputes. Id. at 772. We further opined that given "the slight inconvenience and expense associated with electronically recording custodial interrogations, sound policy considerations support its adoption as a law enforcement practice." Id. Ultimately, however, we held that "the issue of electronically recording custodial interrogations 'is one more properly directed to the General

87

Assembly.'" Id. (quoting State v. Odom, 928 S.W.2d 18, 23-24 (Tenn. 1996)). In so holding, we emphasized that "'[t]he determination of public policy is primarily a function of the legislature.'" Id. (quoting Griffin v. Shelter Mut. Ins. Co., 18 S.W.3d 195, 200-01 (Tenn. 2000)).

Id. at 564.

Our supreme court opined that:

whether, as a matter of public policy, Tennessee should mandate electronic recording of custodial interrogations is a question for the General Assembly, not this Court. A defendant's statement need not be suppressed because a law enforcement agency has adopted a policy against recording interrogations. Such a policy does not violate the heightened due process concerns that apply in capital cases.

Id. at 565. Accordingly, we cannot conclude that the defendant's rights to a fair trial were violated by the failure to have his statement videotaped. The defendant is not entitled to relief on this issue.

## C. Prosecutorial Misconduct

### 3. Destruction of Urine and Blood Samples

The defendant claims that his rights to a reliable sentencing determination, as well as his rights to confrontation, due process, and to present a defense, were violated by the State's destruction of urine and blood samples. The defendant asserts that the question of premeditation and issues regarding sentencing and mitigation were directly affected by his mental state and involved what effects alcohol and drugs could have had on that mental state. The defendant contends as constitutional error the fact that the Tennessee Bureau of Investigation destroyed the blood and urine samples which rendered them unavailable for further testing and made it impossible to accurately judge his alcohol and blood content through separate analysis.

In State v. Ferguson, 2 S.W.3d 912, 914 (Tenn. 1999), the Tennessee Supreme Court addressed the issue as to what factors guide the determination of the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory. The supreme court answered that the critical inquiry was whether a trial, conducted without the destroyed evidence, would be fundamentally fair. Id. In reaching its decision, the Ferguson court noted that its inquiry was distinct from one under Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196 (1963), and United States v. Agurs, 427 U.S. 97, 110-11, 96 S. Ct. 2392, 2401 (1976), because those two cases

88

addressed "plainly exculpatory" evidence, while Ferguson addressed a situation "wherein the existence of the destroyed videotape was known to the defense but where its true nature (exculpatory, inculpatory, or neutral) can never be determined." 2 S.W.3d at 915.

The court went on to explain that the first step in the analysis is determining whether the State had a duty to "preserve" the evidence. Id. at 917. "Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. (footnote omitted). However,

"[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 2533-34 (1984)). Only if the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty must a court turn to a balancing analysis involving consideration of the following factors: "1. The degree of negligence involved; 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and 3. The sufficiency of the other evidence used at trial to support the conviction." Id. (footnote omitted).

The record reflects that the defendant's blood and urine samples were taken on January 11, 2005, and destroyed on January 3, 2006. Between the offense date and the time the samples were destroyed, the defendant failed to file a motion to preserve the evidence. During the trial, the defense presented the testimony of Special Agent John W. Harrison, an analytical toxicologist with the TBI. Special Agent Harrison testified that the result of the defendant's urine test was .17, a reading reflecting the consumption of alcohol. TBI Agent Kelly Hopkins testified that the defendant's urine was positive for Citalopram and Benzodiazepines. Special Agent Harrison also testified extensively as to the metabolism of alcohol.

First, the State is not required to preserve samples taken for the limited purpose of determining the defendant's blood-alcohol level. See Trombetta, 467 U.S. at 491, 104 S. Ct. at 2535. It is common knowledge that human blood is perishable, and specimens of blood can only be maintained for a short period of time. Also, such evidence would not be expected to play a significant role in the accused's defense. Id. Moreover, it appears

from the record that the TBI acted in good faith and apparently destroyed the blood specimen in conformity with the established procedures of the laboratory. State v. Brownell, 696 S.W.2d 362, 363-64 (Tenn. Crim. App. 1985); State v. Dowell, 705 S.W.2d 138, 141-42 (Tenn. Crim. App. 1985). The evidence did not possess any exculpatory value that was apparent prior to its destruction, as the test results were available. Accordingly, the TBI had no duty to preserve the evidence beyond its established procedures. Moreover, even if the State had a duty to preserve the blood sample and failed to do so, the defendant has failed to demonstrate that his right to a fair trial was affected by the destruction of the evidence. See Ferguson, 2 S.W.3d at 917. "[T]he mere loss or destruction of evidence does not constitute bad faith." Edward Thompson v. State, No. E2003-01089-CCAR3-PC, 2004 WL 911279, at *2 (Tenn. Crim. App. Apr. 29, 2004), perm. to appeal denied (Tenn. Oct. 4, 2004).

The second factor is the significance of the missing evidence. The defendant has not offered any proof that the State acted improperly in collecting or testing his blood. It is undisputed that the defendant consented to have his blood drawn and the specimen provided to the officer for the purpose of drug and alcohol testing. At trial, the defendant presented the testimony of Special Agent Harrison, as we have stated, and there was no evidence of tampering prior to testing. The defendant has failed to offer any evidence that the test results reported by Agent Harrison do not accurately reflect the contents of his blood and urine.

Finally, because there is no indication that additional testing of the defendant's blood and urine would have yielded results different from those found by the TBI, it cannot be said that evidence critical to the defense was excluded. Moreover, as it was the defendant who introduced the test results at trial, he cannot complain that he was deprived of his right to present a defense. The defendant is not entitled to relief on this claim.

### F. Introduction of Photographs

The defendant argues that the photographs admitted during the penalty phase were "overly prejudicial and gruesome." Specifically, the defendant argues that exhibit 141, a photograph of the TDOT office depicting blood in the corner was "gruesome and prejudicial." Without singling out any of the other photographic exhibits, the defendant argues, without elaboration, that they are "overly prejudicial and gruesome."

Before entry into evidence of the photographs that the defendant argues were prejudicial, the trial court conducted a lengthy hearing, during which the court examined each of the photographs which the State sought to enter, heard the arguments of counsel as to each photograph, and then ruled as to each photograph. As to all of the photographs, the State explained what each depicted and its relevance to the State's burden of proof.

90

The defense responded that, as to the injuries to the deceased victims, the autopsy reports sufficiently explained the nature and extent of the injuries so that the photographs, some of which defense counsel described as "gory," would prejudice the defendant.

As to the photographs of the deceased victim, David Gordon, the court required that the State remove several of the photographs intended to be entered into evidence and explained the relevance of the others:

> I don't want any duplication on the Gordon photos. For example, the last two photos in the area that [defense counsel] was not certain if he was pronouncing it right, take one or two of those out, and there might be one other one that shows the same thing. But definitely on the last two I want the State to make a decision.
>
> I want to make it very clear that as I view the diagram referred to by [defense counsel], there's such a substantial difference in appreciating the type of injuries sustained in the diagram versus seeing in the photos, and again the Court finds that it is very probative in this case, and since we're at a sentencing hearing and the State's arguing certain aggravators, . . . probative value outweighs the prejudicial effect under these circumstances.
>
> General, show us which one you're going to pull out. Take it out. And at the very first there might have been two that were somewhat of a duplication.

As to the two photographs of the wounded victim, [James] Goff, the court explained why these would be admitted:

> Well[,] the aggravating factor [the prosecutor] stated was the Defendant knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder, and that's the one alluded to, and the State says this would be relevant to that particular aggravator.
>
> Under the circumstances for again the reasons I stated earlier, I believe it would be appropriate because the State wants to use it toward the proof of aggravator. There are only two photos here.

The court explained why the two photographs of the wounded victim, Larry Taylor, would be admitted:

91

The Court's viewing those two photos of Larry Taylor. It's very limited photos in that there's a draping, a white cloth around each of the leg wounds. There is a small amount of blood on the white cloth, but it's certainly not grotesque or something that would in itself outrage the jury. Again, we're at a sentencing hearing, and since the State is wanting to use these two photos for the same reason, I'll stand on the basis I stated earlier when we first talked about photos and let those two photos be introduced at this time, but again, note [defense counsel] now raises the same objection that he stated when we began.

As to the photographs of the deceased victim, Donna Renee Jordan, the court determined that certain of the photographs would not be admitted because they were duplicative and required that portions of others be covered. The court allowed only one photograph of the victim's body at the crime scene and explained why others were admissible:

Again, under the Leach case, it was certainly made clear that certain photos might be very unpleasant, but again, we're dealing with the sentencing phase, and we're dealing with the burden on the State. The jury has heard quite a bit of detail through the guilt phase before they found this Defendant guilty of first degree murder about what took place, the firing sequence. I just believe when you weigh probative and prejudicial in this case, again noting it's the sentencing phase, it's highly, highly probative as the aggravators that the State has pointed out and must prove. I'll allow the one photo in. And I'll note, this is the only one from the crime scene that the State is asking to show under these circumstances.

The admission of photographs is generally discretionary with the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); see also Tenn. R. Evid. 401, 402. Evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. Vann, 976 S.W.2d at 102-03; see also Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]").

While it can be said that photographs of crime victims who suffer serious bodily injury are prejudicial by their very nature, a prejudicial photograph is not *per se* excludable. What is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. Banks, 564 S.W.2d at 951.

Exhibit 141 is a photograph of the crime scene which shows a puddle of blood on the floor and Renee Jordan's arm. The trial court determined that the photograph was relevant and not prejudicial. We agree. Moreover, this court cannot conclude that Exhibit 141 was particularly gruesome or inflammatory. Thus, we conclude that the probative value of the photograph is not outweighed by its prejudicial effect, and the trial court did not abuse its discretion in allowing its admission. Further, it does not affirmatively appear that the "admission of the photograph[ ] has affected the results of the trial." See Banks, 564 S.W.2d at 953. The defendant is not entitled to relief on this issue.

As to the remaining photographs which are not specifically challenged on appeal, this court takes notice of the following proceedings in the trial court. See Tenn. R. App. P. 27. Out of the presence of the jury, the prosecution revealed to the trial court the collective photographs it planned to introduce during the penalty phase. The first set of photographs was described as follows:

1.  A photograph of David Gordon, post-mortem, showing an abrasion to the right side of his forehead taken at the medical examiner's office.

2.  A photograph of David Gordon on a table showing injuries to his right arm and right abdomen. A surgical scar is also visible.

3.  A photograph of David Gordon revealing in detail impact of a wound resulting from asphalt. The photograph also shows injuries to the abdomen, showing the gunshot wounds.

4.  A photograph of the right hip area of David Gordon showing gunshot wounds and also evidence of an intermediate target striking his legs.

5.  A photograph of David Gordon showing injury to the left abdomen, showing approximately three gunshot wounds. Also, there is evidence of surgical scars present in the photograph.

6. A photograph of David Gordon's buttocks' region, showing in detail the gunshot wounds. Also visible are wounds to the left hip and left torso area.

7. A photograph of David Gordon's buttocks' region. Also visible are wounds to the right hip and upper right thigh.

8. A photograph showing a close-up of the wounds of David Gordon showing injuries to the peritoneum, the area between the scrotum and the rectum.

Defense counsel objected to this set of photographs stating that "some of these photographs are quite gory." A specific complaint was made to the photograph of David Gordon's peritoneum. In reviewing this set of photographs, the trial court determined that the photographs were probative in regards to establishing the type of injuries sustained. In this regard, the lower court found that the probative value outweighed the prejudicial effect.

A second set of photographs was described as follows: "photograph taken at the ER showing James Goff, and particularly the injury to his submandibular region." The defendant objected to this set of photographs, stating that the photographs were not those of the deceased. He added that it was prejudicial and improper to show a photograph of a wounded person to the jury in this case. The trial court determined that the photograph was relevant to the State's alleged aggravator that the defendant knowingly created a great risk of death to two or more persons other than the victim murdered.

A third set of photographs depicted injuries sustained to Larry Taylor. The trial court determined that the photograph was relevant to the State's alleged aggravator that the defendant knowingly created a great risk of death to two or more persons other than the victim murdered.

A fourth set of photographs was described as follows:

1. A photograph of Renee Jordan showing the gunshot wound to the forehead.

2. A photograph of Renee Jordan depicting the entry wound to the back of the head.

3. A photograph of Renee Jordan depicting an exit wound to the face, specifically the side of the nostril.

4. A photograph of Renee Jordan depicting the entrance wound to the forehead and the exit wound.

5. A photograph of the total body of Renee Jordan depicting multiple bullet wounds to the abdomen and right breast.

94

6.  A close-up shot of Renee Jordan's breast.

Reviewing the photographs, the trial court removed duplicitous photographs and determined that the photographs were admissible in support of the aggravators alleged by the State.

Additionally, a photograph showing Renee Jordan at the scene lying on the floor with blood surrounding her head was admitted. The trial court determined that the photograph was highly probative of the aggravators alleged by the State.

Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character. See Banks, 564 S.W.2d at 950-51. In this respect, photographs of murder victims are prejudicial by their very nature. However, prejudicial evidence is not excludable *per se.* If this were true, all evidence of a crime would be excluded at trial. Rather, what is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. Id. at 951.

The photographs admitted by the trial court were relevant to supplement the testimony of the medical examiner and to support the aggravating circumstances alleged by the State. See, generally, State v. Cole, 155 S.W.3d 885, 913 (Tenn. 2005) (Appendix). We conclude that the probative value of the photographs was not outweighed by their prejudicial effect, and the trial court did not abuse its discretion in allowing their admission. Further, it does not affirmatively appear that the "admission of the photographs has affected the results of the trial." See Banks, 564 S.W.2d at 953. The defendant is not entitled to relief on this issue.

## G.  Jury Instruction as to Aggravators and Mitigators

The defendant contends that it was a violation of his right to a jury trial under both the Tennessee and United States Constitutions and to a reliable result under the Eighth Amendment for the jury to be instructed that "if aggravators outweigh mitigators beyond a reasonable doubt, the sentence shall be death." In the defendant's view, this instruction removes jury discretion in the sentencing decision. This argument was addressed and rejected in State v. Boyd, 797 S.W.2d 589, 596 (Tenn. 1990), where our supreme court found that "[t]here is no likelihood that this statutory language imposes a 'presumption of death.'" See State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993); State v. Wright, 756 S.W.2d 669, 674 (Tenn. 1988); State v. Teague, 680 S.W.2d 785, 790 (Tenn. 1984). Accordingly, the defendant is not entitled to relief on this issue.

95

## I.  Lethal Injection Unconstitutional

The defendant asserts that Tennessee's lethal injection procedure and protocol violates principles of cruel and unusual punishment.  In support of his claim, the defendant relies upon the United States Supreme Court's grant of certiorari in Baze v. Rees, No. 07-5439 (U.S. Sept. 25, 2007) (granting review to determine the constitutionality of Kentucky's three-drug lethal injection protocol).

On April 16, 2008, the United States Supreme Court decided Baze v. Rees, upholding the State of Kentucky's lethal-injection protocol as not being violative of the Eighth Amendment. Baze v. Rees, 553 U.S. [35], 128 S. Ct. 1520 (2008).  The Supreme Court's plurality found that cruel and unusual punishment occurs where lethal injection as an execution method presents a "substantial" or "objectively intolerable risk of serious harm" in light of "feasible, readily implemented" alternative procedures.  Id. at [51-52], 1531-32.  However, the analysis was focused on the manner of lethal injection.  Id. at [60-62], 1537.  The Baze Court held:

> Kentucky has adopted a method of execution believed to be the most humane available, one it shares with 35 other States . . . [which] if administered as intended . . . will result in a painless death. The risks of maladministration . . . such as improper mixing of chemicals and improper setting of IVs by trained and experienced personnel - cannot remotely be characterized as "objectively intolerable."  Kentucky's decision to adhere to its protocol despite these asserted risks, while adopting safeguards to protect against them, cannot be viewed as probative of the wanton infliction of pain under the Eighth Amendment.

Baze, 553 U.S. at [62], 128 S. Ct. at 1537-38.

For "the disposition of other cases uncertain," Chief Justice Roberts stated that "[a] State with a lethal injection protocol *substantially similar* to the protocol we uphold today would not create a risk that meets [the 'substantial risk'] standard." Id. at [61], 1537 (emphasis added). The protocol adopted in Kentucky involves the combination of three drugs: the first, sodium thiopental, induces unconsciousness when given in the specified amounts and thereby ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs, pancuronium bromide and potassium chloride.

> Among other things, Kentucky's lethal injection protocol reserves to qualified personnel having at least one year's professional experience the responsibility for inserting the intravenous (IV) catheters into the prisoner, leaving it to others to mix the drugs and load them into syringes; specifies

that the warden and deputy warden will remain in the execution chamber to observe the prisoner and watch for any IV problems while the execution team administers the drugs from another room; and mandates that if, as determined by the warden and deputy, the prisoner is not unconscious within 60 seconds after the sodium thiopental's delivery, a new dose will be given at a secondary injection site before the second and third drugs are administered.

Baze, 553 U.S. at [35], 128 S. Ct. at 1522. Tennessee has adopted a three-drug protocol for lethal injection similar to that of Kentucky. See, e.g., Baze, 553 U.S. at [44], 128 S. Ct. at 1527; Workman v. Bredesen, 486 F.3d 896, 902 (6th Cir. 2007); Abdur'Rahman v. Bredesen, 181 S.W.3d 292, 314 (Tenn. 2005). Therefore, we are unable to conclude that Tennessee's lethal injection procedure, which appears facially similar to the procedure considered in Baze, is unconstitutional. The defendant is not entitled to relief on this claim.

_____
ALAN E. GLENN, JUDGE